582 F.2d 750
 Brenda EVANS et al., Lillian Richardson, Mary Woods, Wilbur
R. Carr, Sr., Clifton A. Lewis, Jeanne Q. Lewis, Board of
Public Education of the City of Wilmington (Intervening
Plaintiff), the Urban Coalition of Metropolitan Wilmington Incorporated
v.
Madeline BUCHANAN et al., Robert H. McBride, Elise Grossman,
Joseph J. Crowley, William E. Spence, Clyde Bishop and
Richard H. Farmer, constituting all the members of the State
Board of Education of the State of Delaware, Delaware
Association of School Boards, Intervening Defendants, Alexis
I. duPont, Alfred I. duPont, Appoquinimink, Claymont,
Conrad, Marshallton-McKean, Mt. Pleasant, New Castle-Gunning
Bedford, Newark, and Stanton School Districts, DeLaWarr
School District.
Appeal of ALEXIS I. duPONT SCHOOL DISTRICT, in No. 77-2336.
Appeal of DELAWARE STATE BOARD OF EDUCATION and the
following defendant school districts, Alexis I. duPont
School District, Alfred I. duPont School District, Claymont
School District, Conrad Area School District, New
Castle-Gunning Bedford School District, Marshallton-McKean
School District, Newark School District, Mount Pleasant
School District and Stanton School District, in No. 77-2337.
Appeal of CLAYMONT SCHOOL DISTRICT and Stanton School
District, in No. 78-1143.
Appeal of NEW CASTLE-GUNNING BEDFORD SCHOOL DISTRICT, in No.
78-1144.
Appeal of DELAWARE STATE BOARD OF EDUCATION, in No. 78-1145.
Appeal of ALFRED I. duPONT SCHOOL DISTRICT, Alexis I. duPont
School District, Conrad School District and Mount
Pleasant School District, in No. 78-1146.
Appeal of NEWARK SCHOOL DISTRICT, in No. 78-1147.
Appeal of MARSHALLTON-McKEAN SCHOOL DISTRICT, in No. 78-1148.
STATE OF DELAWARE, in No. 78-1743.
v.
The Honorable Murray M. SCHWARTZ, United States District
Judge for the District of Delaware.
 Nos. 77-2336, 77-2337, 78-1143 to 78-1148 and 78-1743.
 United States Court of Appeals,
Third Circuit.
 Argued In Banc May 10, 1978.
Decided July 24, 1978.
 
 Samuel R. Russell, Biggs & Battaglia, Wilmington, Del., for appellant, Alexis I. duPont School Dist. in 77-2336 only.
 Richard R. Wier, Jr., Atty. Gen. of the State of Delaware, Regina M. Small, Deputy Atty. Gen. of the State of Delaware, William Prickett, H. James Conaway, Jr., Young, Conaway, Stargatt & Taylor, Wilmington, Del., Philip B. Kurland, Chicago, Ill., Mason E. Turner, Jr., Prickett, Ward, Burt & Sanders, Wilmington, Del., for the Delaware State Bd. of Ed.
 James T. McKinstry, Richards, Layton & Finger, Wilmington, Del., for Claymont School Dist. and Stanton School Dist.
 David F. Anderson, Potter, Anderson & Corroon, Wilmington, Del., for New Castle-Gunning Bedford School Dist.
 William Poole, Potter, Anderson & Corroon, Wilmington, Del., for Alfred I. duPont School Dist.
 Edward W. Cooch, Jr., Cooch & Taylor, Wilmington, Del., Lino A. Graglia, Austin, Tex., for Marshallton-McKean School Dist.
 Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for Mt. Pleasant School Dist.
 John P. Sinclair, Potter, Anderson & Corroon, Wilmington, Del., for appellants, Alexis I duPont School Dist., Alfred I. duPont School Dist., Conrad School Dist., Mt. Pleasant School Dist., Claymont School Dist., Stanton School Dist., New Castle-Gunning Bedford School Dist. and Newark School Dist.
 Jerome O. Herlihy, Herlihy & Herlihy, Wilmington, Del., for Conrad Area School Dist.
 Louis L. Redding, Joseph Rosenthal, Irving Morris, Morris & Rosenthal, Wilmington, Del., Louis R. Lucas, Ratner, Sugarmon, Lucas, Salky & Henderson, Memphis, Tenn., for appellees.
 Paul R. Dimond, O'Brien, Moran & Dimond, Ann Arbor, Mich., William L. Taylor, Center for National Policy Review, Washington, D. C., Aida Waserstein, Education Law Center, Inc., Philadelphia, Pa., for intervening plaintiff.
 ON PETITION FOR WRIT OF MANDAMUS
 Floyd Abrams, New York City, Sp. Counsel for the State of Delaware, by appointment of Governor Pierre S. du Pont, IV and Atty. Gen. Richard R. Wier, Jr., Morris, James, Hitchens & Williams, Henry N. Herndon, Jr., Edward M. McNally, Edward S. Sacks, Wilmington, Del., for the New Castle County Planning Bd. of Ed.; Ira J. Dembrow, Andrew L. Deutsch, Cahill, Gordon & Reindel, New York City, of counsel.
 Before ALDISERT, ADAMS, ROSENN, HUNTER, WEIS, GARTH and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 The consolidated appeals by the Delaware State Board of Education and nine school districts from the district court's ordering of a desegregation plan in the suburban New Castle County public schools require us to decide if the district court misused its discretion when it rejected a state-designed plan and adopted another plan designed to remedy constitutionally defective segregated schools in eleven public school districts. Evans v. Buchanan, 447 F.Supp. 982 (D.Del.1978). We conclude that the court did not act improperly and, accordingly, affirm.
 
 I.
 
 2
 Although Delaware state court proceedings addressed this very serious constitutional problem as far back as 1952, this case has continuously commanded the attention of the federal courts the district court, this court, and the Supreme Court since 1957. Its history up until 1974 is discussed comprehensively in Evans v. Buchanan, 379 F.Supp. 1218, 1220-21 (D.Del.1974), in which a three-judge court determined that the Wilmington schools which had been De jure black schools prior to the Supreme Court's decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I ), continued to remain identifiably black, and that the dual school system in Wilmington had not been eliminated. In a subsequent opinion, the three-judge court found Inter-district, de jure segregation throughout Northern New Castle County, and ordered submission of both Wilmington-only and inter-district plans to remedy that segregation. Evans v. Buchanan, 393 F.Supp. 428 (D.Del.1975). This judgment was summarily affirmed by the Supreme Court. Buchanan v. Evans, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975) (three Justices dissenting).
 
 
 3
 Thereafter, the district court conducted three weeks of evidentiary hearings on remedial plans submitted by the parties, specifically affording appellants the opportunity of demonstrating whether the impact of the inter-district violations was limited. At the conclusion of testimony, the court found that the inter-district violations had "a substantial, not a de minimis, effect on the enrollment patterns of the separate districts," and that racially discriminatory acts of the State and its subdivisions were "a substantial and proximate cause of the existing disparity in racial enrollments in the districts of Northern New Castle County." Evans v. Buchanan, 416 F.Supp. 328, 339 (D.Del.1976). Reiterating its finding of Inter-district violations,[1] the court considered the various submitted plans, finding Wilmington-only plans unacceptable, Id. at 343-44, and rejecting the specific inter-district remedies proposed by the parties.[2] Rather, on June 15, 1976, the district court ordered that Delaware schools in the area north of the northern line of the Appoquinimink School District[3] be desegregated and reorganized into a new or such other new districts as would comply with the court's opinion, which set the date for full compliance with constitutional requirements on all grade levels as September 1978. Id. at 361. In ordering reorganization or consolidation of school districts, the district court placed the laboring oar in developing an acceptable plan squarely in the possession of State authorities. See id. at 357.
 
 
 4
 Certain appellants took an appeal from this order to the Supreme Court which, on November 29, 1976, dismissed the appeal on jurisdictional grounds. 429 U.S. 973, 97 S.Ct. 475, 50 L.Ed.2d 579 (1976). An appeal to our court followed. We affirmed the basic concept of the remedy ordered by the district court. Our opinion was filed on May 18, 1977, Evans v. Buchanan, 555 F.2d 373 (3d Cir. 1977) (in banc), and the Supreme Court denied Certiorari on October 3, 1977. 434 U.S. 880, 98 S.Ct. 236, 54 L.Ed.2d 160 (1977) (three Justices dissenting).
 
 A.
 
 5
 In order to set the stage for our consideration of the present appeal, it is important to emphasize what we did when this case was before us last year. First, we viewed ourselves as precluded by the Supreme Court's summary affirmance of the district court's 1975 order from re-examining the existence of substantial inter-district violations. See 555 F.2d at 377-78. We adhere to the fundamental law of the case principle in the present appeal.[4]
 
 
 6
 More important for present purposes, we also "affirm(ed) the basic concept of the remedy ordered by the district court." Id. at 380. It bears reemphasis that this basic concept called for "the State Legislature and the State Board of Education (to) take such steps as are not violative of constitutional rights to change the pattern set here," Id. at 380, Quoting 416 F.Supp. at 357, thus placing the primary responsibility for correcting the violations on the State and not on the district court or a court-created board. We adhere to, and reiterate the fundamental philosophy of this court: court-designed plans, or plans created by a new board were Not to be effectuated unless the State failed in its responsibility to come forward with an effective solution to the problem. A new board to operate the schools was authorized only on a stand-by basis, "for so long as the State takes no action." Id. at 380.
 
 
 7
 We summarized in our prior opinion, and reiterate now, some basic legal precepts relating to the extent of remedies a federal court may order:
 
 
 8
 A court is not at liberty to issue orders merely because it believes they will produce a result which the court finds desirable. The existence of a constitutional violation does not authorize a court to seek to bring about conditions that never would have existed even if there had been no constitutional violation. The remedy for a constitutional violation may not be designed to eliminate arguably undesirable states of affairs caused by purely private conduct (De facto segregation) or by state conduct which has in it no element of racial discrimination. This much is settled by Milliken v. Bradley, (418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974)). See also Spencer v. Kugler, 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972), Affirming 326 F.Supp. 1235 (D.N.J.); Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450. Nor may a remedial desegregation order require "as a matter of substantive constitutional right, any particular degree of racial balance or mixing" ( . . . ) Swann v. Board of Education, supra, 402 U.S. (1) at 24, 91 S.Ct. (1267) at 1280 (28 L.Ed.2d 554) . . . (See also ) Milliken v. Bradley, 418 U.S. (717) at 740-41 (94 S.Ct. 3112, 41 L.Ed.2d 1069). . . . These are limitations by which a trial court must abide.
 
 
 9
 The task of a remedial decree in a school desegregation case is simply to correct the constitutional violation and to eradicate its effects. "As with any equity case, the nature of the violation determines the scope of the remedy." Swann v. Board of Education, supra, 402 U.S. at 16, 91 S.Ct. at 1276.
 
 
 10
 555 F.2d at 379-80.
 
 
 11
 Subsequent to our 1976 decision, the Supreme Court summarized these Same precepts in Dayton Board of Education v. Brinkman, 433 U.S. 406, 419-20, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977):
 
 
 12
 The power of the federal courts to restructure the operation of local and state governmental entities "is not plenary. It 'may be exercised "only on the basis of a constitutional violation." ' (Milliken v. Bradley ), 418 U.S., at 738 (94 S.Ct. 3112, at 3124), quoting Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 16(, 91 S.Ct. 1267, 1276). See Rizzo v. Goode, 423 U.S. 362, 377(, 96 S.Ct. 598, 46 L.Ed.2d 561). Once a constitutional violation is found, a federal court is required to tailor 'the scope of the remedy' to fit 'the nature and extent of the constitutional violation.' 418 U.S., at 744 (, 94 S.Ct. at 3127, 41 L.Ed.2d at 1091); Swann, supra, at (402 U.S.) at 16(, 91 S.Ct. at 1276, 28 L.Ed.2d at 566)." Hills, supra, at 293-294 (96 S.Ct. at 1544). See also Austin Independent School Dist. v. United States, 429 U.S. 990, 991(, 97 S.Ct. 517, 50 L.Ed.2d 603) (1976) (Powell, J., concurring).
 
 B.
 
 13
 Thus when these proceedings were remanded to the district court for the action giving rise to the present appeal, the case had assumed the following jurisprudential posture:
 
 
 14
 A. The existence and character of substantial inter-district violations had been adjudicated and were no longer open to review.
 
 
 15
 B. The geographic scope of the remedy was fixed as all districts north of the northern line of the Appoquinimink School District.
 
 
 16
 C. We had determined that the district court had not misused its discretion in rejecting certain voluntary plans proposed by appellants to cure the violation.
 
 
 17
 D. The primary responsibility to fashion a remedy was placed on the State of Delaware, through its legislature or its Board of Education.
 
 
 18
 E. State authorities were required to file with the district court within 60 days a formal report of their efforts to carry out the mandate of the district court.
 
 II.
 
 19
 Appellants first argue that, after our remand, the district court erred in rejecting the plan submitted by the State Board pursuant to the mandate of this court.
 
 A.
 
 20
 The "plan" submitted by the State Board was included in a report filed July 14, 1977, during the time span between our opinion and the Supreme Court's denial of Certiorari. Dubbed "reverse volunteerism," the proposal would have required that all Wilmington black students in grades 7 through 12 be assigned to the suburban districts for the school year 1977-78, and that in subsequent years, grades 1 through 6 be incorporated into the plan. Each student so reassigned, however, would have retained the right to remain in his or her Wilmington school.[5] Presumably, this "plan" was intended to complement state legislation which had been enacted subsequent to the three-judge court's remedy order. Authorizing majority to minority voluntary transfers, this legislation was also offered in the State Board's Report as evidence of the State's compliance with the federal court mandates.[6] The actual "plan" contained in the July 14 report, however, had not been adopted by the State legislature and had no implementing legislation to support it.
 
 
 21
 After a week of hearings on the reverse volunteerism plan, on August 5, 1977, in its opinion granting a limited stay pending the Supreme Court's disposition of the petition for Certiorari, the district court rejected the State Board's proposal. Evans v. Buchanan, 435 F.Supp. 832 (D.Del.1977). After determining that the absence of implementing legislation precluded adoption of the state plan, the court stated, in the alternative:
 
 
 22
 Even if this Court were permitted to consider the State Board's proposal, the result in this case would be no different. I find the proposal unacceptable as an equitable remedy for the constitutional violations found by the three-judge court. The most obvious and significant flaw is that the proposal places the entire burden of the remedy on those whose rights have been violated. In formulating a remedy for constitutional violations, this Court must exercise its equitable powers. One would find it difficult to create a more graphic paradigm of an inequitable remedy than one which assigns to those who have been wronged the responsibility of correcting those wrongs. The uncontroverted testimony from State Board of Education personnel adduced at the hearings established that: no white student, suburban or city, would be assigned to a different school district, but every black student in Wilmington would be reassigned.
 
 
 23
 Id. at 840-41 (footnote omitted).
 
 
 24
 Bolstering these conclusions was the district court's finding regarding the ineffectiveness of the legislative voluntary transfer program:
 
 
 25
 For the 1977-78 school year, somewhere between 746 and 1,194 or between approximately 6.6 and 10.5% Of the black students from Wilmington have elected to transfer to a suburban district. In addition, 302 black students from DeLaWarr or approximately 17.5% Of the DeLaWarr black student population elected to transfer to other suburban districts. In contrast to voluntary transfer of blacks, only 3 white students elected to transfer into Wilmington and none into DeLaWarr.
 
 
 26
 435 F.Supp. at 837 n.14 (citations omitted).
 
 B.
 
 27
 As we consider the propriety of the district court's rejection of the State Board's proposal, it is important to recognize that, as a reviewing court, we are not empowered to consider the matter De novo. The approval of a desegregation plan is committed to "the exercise of the district judge's discretion . . . (and) a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right." Swann v. Board of Education, 402 U.S. 1, 15-16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 1069 (1971). The Supreme Court teaches that the exercise of discretion involves certain functional parameters: "(D)iscretion imports not the court's 'inclination, but . . . its judgment; and its judgment is to be guided by sound legal principles.' Discretion is vested . . . to allow the most complete achievement of the objectives . . . attainable under the facts and circumstances of the specific case." Franks v. Bowman Transportation Co., 424 U.S. 747, 770-71 (96 S.Ct. 1251, 1267, 47 L.Ed.2d 444,) (1976), Quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 (95 S.Ct. 2362, 45 L.Ed.2d 280,) (1975). And, as we stated when these proceedings were before us in 1977, "an improper use of discretion exists only when the judicial action is arbitrary, fanciful, or unreasonable, or when improper standards, criteria, or procedures are used." 555 F.2d at 378.
 
 
 28
 Abiding by these precepts, we reject appellants' argument that the district court misused its discretion in refusing to accept the State Board's reverse volunteerism proposal as a satisfactory response to this court's mandate. The first obvious deficiency is the plan's failure to comport with our specific mandate: in affirming the three-judge court order, we directed that the school districts "be reorganized into a new or such other new districts as shall be prescribed by the state legislature or the State Board of Education," 555 F.2d at 381, and the State appellants failed to submit Any plan of mandatory reorganization. Second, the district court properly perceived as an unacceptable difficulty the State's failure to provide State executive or legislative action to implement its proposal. The plan could go into effect only if ordered by a federal court. Third, like its reference to the legislative voluntary transfer plan, in which only three white students took part, the State Board's "plan" carried with it the tacit assumption that only and that all black students benefit from transferring to a white environment, and not Vice versa. The district court properly refused to accept such an untenable assumption. In this regard, the State Board's solution simply failed to meet the standard for voluntary plans set forth in Green v. County School Board, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968): "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work Now."
 
 
 29
 And finally, as stated by the district court, perhaps the most glaring weakness in the State Board's plan is that it would improperly shift the "entire burden of the remedy" onto "those whose rights have been violated." 435 F.Supp. at 840.[7] Precepts of equity lie at the heart of any desegregation remedy, and fairness and justice furnish the fiber and sinew of those precepts. The district court recognized this and we refuse to fault its judgment in perceiving what it considered to be the basic inequity in the Board's proposal: "One would find it difficult to create a more graphic paradigm of an inequitable remedy than one which assigns to those who have been wronged the responsibility of correcting those wrongs." Id. Indeed, neither by brief nor by oral argument have appellants supplied this court with an effective rebuttal to the district court's identification of this, the plan's most basic defect.
 
 III.
 
 30
 While appellants contest the district court's rejection of the State Board's proposal, they garner their major attack for the plan eventually approved by the district court.
 
 A.
 
 31
 After determining that the State had failed to meet its responsibility to submit a plan "eliminating the dual school system . . . and the vestige effects of de jure segregation," 555 F.2d at 381, the district court, in accordance with the decrees of both the three-judge court and this court, appointed members of a New Board (the "New Castle County Planning Board of Education", or "NCCPBE") to oversee the operation of schools in the relevant area, and to prepare a plan for the operation of unitary desegregated schools. The district court was presented with five plans; two came from the NCCPBE, three from the NCCPBE's Pupil Assignment Committee. Because building capacities vary appreciably among the different school districts,[8] under all plans schoolchildren in the predominantly black areas were reassigned for a greater number of years than their suburban counterparts.
 
 
 32
 The NCCPBE majority proposal was a "10-2 Concept," under which all students from the two predominantly black districts would be reassigned to the predominantly white districts for ten years, and all students from the predominantly white districts would be reassigned to the predominantly black districts for two consecutive years. The court rejected this proposal because, among other reasons, it would "(base) a decision adverse to black students on a grade fraction favorable to black students, ([9] reassign only black children in the tender elementary years, and fail to use any of the black high schools as 10-12 grade centers." 447 F.Supp. at 1002.
 
 
 33
 The NCCPBE minority plan, "Plan W," attempted to increase the number of years that black students would spend in their home districts. Noting that this plan was considered the least attractive alternative by the New Board, the State Board, and the defendant school districts, the district court stated that it "holds scant promise of satisfactory implementation." Id. at 1004. Among the plan's perceived weaknesses were its failure to keep students together during the course of their educations to the same degree possible under other plans, and its failure to assign a significant number of students from the predominantly white districts to the predominantly black districts for any amount of time at all.
 
 
 34
 Finally, the district court was presented by the Pupil Assignment Committee with three distinct 9-3 plans: the "S" configuration, the "IF" configuration, and the "G" concept. The court concluded that the "G" concept was the best of the three:
 
 
 35
 Among the several illustrations generated by the Pupil Assignment Committee, the "G" configuration appears superior. The G illustration retains a tight feeder pattern and provides a full grade span in the predominantly black Wilmington district, thus including use of at least one of the Wilmington high schools as a high school. Under the G illustration, when the Wilmington children are assigned back to the city for three years, they necessarily attend a school close to their homes. This feature, apparently afforded children from predominantly white districts under the 10-2 plan, simply ought to be preserved as much as possible. The use of geocodes also permits the possible high school use of both Wilmington high schools should the NCCPBE decide such use to be educationally satisfactory. Further, the increased flexibility under G permits easy modification in the future should adjustments be necessary or desirable. Where the educational patterns of thousands of children are involved, a flexible approach is advantageous; G appears to be such a plan.
 
 
 36
 Id. at 1005. Ultimately, the court determined that the evidence did indeed demonstrate "sufficient capacity . . . to render feasible a 9-3 plan,"[10] Id. at 1007, and entered an order directing implementation of the plan by September 1978.
 
 B.
 
 37
 Our focal point in analyzing this remedy is to understand that its purpose is to eradicate the effects of segregation caused by constitutional violations; thus the quantum and quality of the remedy must be designed in accordance with the previous violation determinations.[11] Again, we recognize that the formulation of a practical and effective remedy is an undertaking peculiarly within the province of the trial court, and we intend to defer to the court's exercise of remedial discretion if it has applied the proper legal precepts and remained within determined legal boundaries.
 
 
 38
 With respect to the controlling legal precepts, however, appellants vigorously contend that the district court failed to heed the following instruction from Dayton Board of Education, supra :
 
 
 39
 The duty of both the District Court and of the Court of Appeals, in a case such as this, where mandatory segregation by law of the races in the schools has long since ceased, is to first determine whether there was any action in the conduct of the business of the school board minority pupils, teachers or staff. . . . If such violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a systemwide impact may there be a systemwide remedy. Keyes (v. School District No. 1), 413 U.S. (189,) at 213, 93 S.Ct., at 2699.
 
 
 40
 433 U.S. at 420, 97 S.Ct. at 2775. Appellants argue that the failure of the district court to determine the exact amount of "incremental segregative effect" flowing from the violations here rendered the remedy an abuse of discretion. We disagree, concluding instead that Dayton involved a factual setting crucially distinct from that here.
 
 
 41
 The above quotation from Dayton reveals that the Court was focusing on a district court's duty where, as it found in Dayton, "mandatory segregation by law has long since ceased." The Dayton Court specifically noted that racially segregated public schools had been illegal throughout since Ohio since 1888. 433 U.S. at 410 n.4, 97 S.Ct. at 2770. Delaware's history of public school segregation stands in stark contrast to Ohio's. Until 1954, the law of Delaware Mandated the separation of the races in the public schools. 379 F.Supp. 1218, 1220 (D.Del.1974). The three-judge district court in this case specifically found in 1974 "that segregated schooling in Wilmington has never been eliminated and that there still exists a dual school system." 379 F.Supp. at 1223. In a subsequent opinion, the three-judge district court found that, at the time of Brown, "Wilmington and suburban districts were not meaningfully 'separate and autonomous' " and that "the racial characteristics of city and suburban schools are still interrelated." 393 F.Supp. 428, 437-38 (D.Del.1975). Furthermore, the court found "(a) a historic arrangement for inter-district segregation within New Castle County (and) (b) significant governmental involvement in inter-district discrimination." 393 F.Supp. at 447.
 
 
 42
 Thus, in addressing appellants' Dayton argument, we are confronted with clear findings of the district court, first, that the mandatory segregation of the races by the law of Delaware did not cease long ago, and second, that because the dual school system was never dismantled, the consequences of the mandatory segregation of the races in New Castle County have continued up till the present day.
 
 1.
 
 43
 Heeding Chief Justice Burger's reminder that in framing an equitable remedy in a school desegregation case "(t)he task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution," Swann, supra, 402 U.S. at 16-17, 91 S.Ct. at 1276, we must recognize that the "condition that offends the Constitution" was, as found by the district court, a pervasive De jure inter-district segregation throughout Wilmington and the named Northern New Castle County school districts, in which there was significant governmental involvement. Although there have been references to discrete constitutional violations, See note 11 Supra, it is the combined Effect of all of the separate violations that must be cured by the remedy.
 
 
 44
 That the "condition that offends the Constitution" was found to be inter-district in nature and extending throughout the eleven-district area required that the remedy be congruent with the affected geographic area. Given the pervasive nature of the condition and the extensive area implicated by the findings of the three-judge court, the court fashioned a remedy that was prima facie reasonable, to-wit, a plan that sought to root out segregative effects in the inter-district area, a plan designed "to extirpate the De jure segregation and dual school system in Northern New Castle County," 447 F.Supp. at 985, and to restore the school system to the status it would have enjoyed but for the constitutional violations. In our view, once this showing was made, the burden passed to the defendant-appellants to demonstrate by evidence and testimony that the proffered plan was "arbitrary, fanciful, or unreasonable," See Evans v. Buchanan, supra, 555 F.2d at 378, by specifying in what respects the reach of the plan exceeded the grasp of the conditions created by constitutional violations. The defendant-appellants failed to meet this burden.
 
 
 45
 During the three weeks of evidentiary hearings conducted by the three-judge court after the judgment on the violation, during hearings by the district court in July 1977 after remand by this court, and again during additional remedy hearings that began in October 1977, appellants were afforded the opportunity to offer proof that some or all of the remaining segregation that prevailed through the schools of Northern New Castle County was not the product of the substantial inter-district violation found by the three-judge court and, thus, not properly the subject of proposed remedial plans. They failed to come forward with the required evidence to contravene the remedy adopted by the court. Indeed, not only did they not proffer evidence of the extent of the vestigial conditions to show in what respects the remedy swept too broadly, but appellants took the position that it was Impossible for them to identify the precise vestigial conditions. The State Board's major contention in the proceedings below was: "It is not feasible to determine what today's situation would be with the school system and the student population in the eleven affected districts 'but for' the alleged constitutional violations." Report of the State Board of Education Required by the Opinion and Order of the Circuit Court of Appeals in This Case, at 36-37. (Doc. 548) (emphasis added).
 
 
 46
 It is true that in many cases the burden of proving the incremental segregative effect of constitutional violations may be properly placed on the plaintiff (See Dayton Board of Education, supra ), since that showing is normally an element of the plaintiff's case going to remedy. We do not decide here, however, in which cases the burden shifts to the defendant and in which it does not. We hold that, in a case such as this, where there is an historical pattern of significant De jure segregation with pervasive inter-district effects, where a facially reasonable plan is proposed to remedy those effects, where the defendant itself admits that it is not feasible to separate out the incremental segregative effects of the constitutional violations from the segregative effects of demographic changes, where the defendant itself is in the best position to ascertain what the pattern of segregation would have been "but for" the constitutional violations, and where the defendant has dragged its heels and obstructed progress toward desegregation for twenty-six years, then the burden of proof shifts to the defendant. Thus the Defendant, if it opposes the remedy put forward by the plaintiff or the district court, must show the incremental segregative effects of the constitutional violations, and must show how the proposed remedy goes beyond that incremental impact. To hold otherwise would be tantamount to holding that the plaintiffs are without remedy.
 
 2.
 
 47
 Although recognition of our proper appellate role in reviewing the exercise of discretion by itself compels our conclusion that appellants did not meet their burden of proof, previous Supreme Court teachings on burdens of proof in various phases of school desegregation cases offer additional support. A line of important school cases strongly suggests that it was the burden of the defendant school boards here to go forward with evidence to challenge the propriety of a proposed remedy. For example, in Green v. County School Board, supra, 391 U.S. at 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716, the Court stated pointedly that "(t)he burden on a school board today is to come forward with a plan that promises realistically to work . . . Now . . . until it is clear that state-imposed segregation has been completely removed." And in Swann, supra, 402 U.S. at 26, 91 S.Ct. at 1281 the Court advised that "the burden upon the school authorities will be to satisfy the court that (their schools') racial composition is not the result of present or past discriminatory action on their part."
 
 
 48
 The circumstances best approximating those of the present case are found in Keyes v. School District No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), in which segregative practices within one section of the City of Denver were said to have produced segregative effects in other sections. The Supreme Court stated that "if respondent School Board cannot disprove segregative intent, it can rebut the prima facie case only by showing that its past segregative acts did not create or contribute to the current segregated condition of the core city schools." Id. at 211, 93 S.Ct. at 2699. Moreover, "after past intentional actions resulting in segregation have been established (,) the burden becomes the school authorities' to show that the current segregation is in no way the result of those past segregative actions." Id. at n.17, 9 S.Ct. at 2699 n.17. Keyes also holds that a finding of intentional segregation "in a meaningful portion of a school system . . . creates a presumption that the other segregated schooling within the system is not adventitious." Id. at 208, 93 S.Ct. at 2697. And, extremely significant for our purposes, the Court stated:
 
 
 49
 (W)here a meaningful portion of the system is found to be intentionally segregated, the existence of subsequent or other segregated schooling within the same system justifies a rule imposing on the school authorities the burden of proving that this segregated schooling is not also the result of intentionally segregative acts.
 
 
 50
 The Keyes Court relied on considerations of "policy and fairness based on experience in the different situations" in deciding when to shift the burden of proof. 413 U.S. at 209, 93 S.Ct. at 2698. Considerations of "policy and fairness" make it even clearer here than in Keyes that the burden should be on defendants. In Keyes, a violation had been found only in a limited geographical area and, as a result, the burden was placed on the defendants to prove that the racial disparity in other areas was not also the product of constitutional violations. Here, we have a finding that governmental activity was a significant cause of discrimination Throughout the inter-district area.
 
 
 51
 Appellants cannot, consistent with the guidance of Keyes, argue on the one hand that the remedy approved by the district court covered conditions which are not effects of De jure segregation and on the other hand contend that it is not feasible to determine precisely what "today's situation would be . . . 'but for' the alleged constitutional violations." Not only does this avoid their established burden, but the logical extension of the argument is untenable that no possible remedy can be formulated in this case. Desegregation remedies being drawn from the heart of equity, no court could be so callous as to accept the contention that although vestiges of De jure discrimination pervade to this day, it is helpless to fashion a remedy to root them out.
 
 3.
 
 52
 Apart from our concern that appellants' misperception of "burdens" be corrected, we agree with the district court that appellants' Dayton argument is "a belated attempt to relitigate an issue already conclusively resolved in this case, with all right of appeal exhausted." 447 F.Supp. at 1009. First, to the extent that Dayton requires detailed findings of fact and reasoned statements of law regarding the constitutional violations which exist, the numerous prior opinions involved in this litigation more than adequately predicted and satisfied those requirements. See e. g., 393 F.Supp. at 432-38; 416 F.Supp. at 341 (district court specifically recognized its "duty . . . to order a remedy which will place the victims of the violation in substantially the position which they would have occupied had the violation not occurred"), Aff'd, 555 F.2d 373 (3d Cir. 1977). Second, we agree that whatever its general relevance be, Dayton is so factually distinct from the present litigation as to circumscribe detailed analogy. Not the least of the differences between the two cases is that the system-wide remedy eventually disapproved in Dayton rested on three "relatively isolated" violations that could be deemed "of questionable validity." 433 U.S. at 413, 93 S.Ct. 2686. And finally, the unavoidable distinction is that prior to Brown I, in New Castle County, Delaware, Desegregation was unlawful under Delaware law; in Dayton, Ohio, Segregation was unlawful under Ohio law. This difference between the two states is, at base, the difference between the two cases.
 
 C.
 
 53
 That the primary responsibility to devise a suitable plan was and is that of the State of Delaware, and not the federal courts, and that appellants' Dayton argument is more properly directed toward their own failure of proof, should not come as any surprise to appellants. As early as 1952, in a predecessor action to the present proceedings, the Delaware Supreme Court ordered the immediate admission of black children to certain schools previously attended only by white children because, historically, Delaware had required its public school students to attend segregated schools. Gebhart v. Belton,33 Del. 144, 91 A.2d 137 (1952). On appeal to the Supreme Court, the Gebhart case was consolidated with other cases and affirmed by the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I ), again affirmed in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II ), and remanded to the Supreme Court of Delaware for further proceedings to require "a prompt and reasonable start toward full compliance" with Brown I and "to effectuate a transition to a racially nondiscriminatory school system." 349 U.S. at 300-01, 75 S.Ct. at 756.
 
 
 54
 We set forth this history here to emphasize the length of time the State of Delaware has been directed by judicial decrees to fashion a remedy to eliminate the vestiges of De jure segregation. We are in fact emphasizing two faces of the same coin: that the present case results from statutorily mandated De jure segregation, not from isolated acts of state authority, or from what is sometimes called De facto segregation; and that State authorities have been made aware of their responsibilities by state and federal courts for some twenty-six years. This emphasis bears repetition because of the persistent attempts by appellants to have the federal courts re-examine the findings of constitutional violations in New Castle County, Delaware, the latest effort being to argue, albeit indirectly, that the decision in Dayton commands a different result. For the foregoing reasons, we disagree that Dayton alters the law in this case.
 
 IV.
 
 55
 In addition to addressing a pupil reassignment plan, the district court's opinion and order instructed the New Board to implement guidelines which the court delineated in eight areas of ancillary relief: in-service training; reading and communications skills; curriculum; counseling and guidance; school building construction, site selection, and use of existing schools; recognition of human values; standards of conduct; and staff.
 
 
 56
 We note at the outset that there is no serious dispute as to the validity, and even the necessity, of such substantive programs.[12] Indeed, after a scrupulous review of the lengthy record compiled before the district court, we are impressed that no party ever seriously contested or controverted the value of programs testified to by numerous witnesses. The State appellants[13] nevertheless challenge the district court's authority to order such relief, urging that "(n)o claim has ever been made that the (present) educational offerings in any of the affected districts in the areas of reading, guidance, human relations or the like were constitutionally suspect or infected with discriminatory bias." State Appellants' Brief at 26. The underpinnings of their discontent are twofold: first, they offer a varying interpretation of the guiding legal precept, Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Milliken II ), and second, they question whether a court should order such remedies, contending that a school board should exercise complete autonomy in this area.
 
 
 57
 For the following reasons, we believe that the law is settled that the district court may, and in these circumstances, properly did, order ancillary relief.
 
 A.
 
 58
 The legal focal point in an analysis of the propriety of ancillary relief must be Milliken II, supra, a recent Supreme Court case which offers strong support for the concept. Addressing the question whether a district court can, as an adjunct to a desegregation decree, order remedial educational programs for children who have been subjected to past acts of De jure segregation, the Court stated the "basic rule" that "(i)n fashioning and effectuating the (desegregation) decrees, the courts will be guided by equitable principles." 433 U.S. at 279-80, 97 S.Ct. at 2757, Quoting Brown II, supra, 349 U.S. at 300, 75 S.Ct. 753.
 
 
 59
 The specific ancillary programs challenged in Milliken II were in-service training for teachers and administrators, guidance and counseling programs, revised testing procedures, and a remedial reading and communications skills program. These programs, along with numerous others, were originally suggested by the Detroit School Board and were the subject of extensive hearings before the district court. "Substantial testimony was adduced with respect to the proposed educational components, including testimony by petitioners' expert witnesses." 433 U.S. at 274, 97 S.Ct. at 2754. Petitioners nevertheless claimed that the district court's order exceeded the scope of the constitutional violation, I. e., the unlawful segregation of students on the basis of race, contending that any remedial decree was limited by the scope of this violation to remedying only unlawful pupil assignment. Rejecting this contention, the Milliken II Court stated:
 
 
 60
 The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the constitutional violation itself. Because of this inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation, see Pasadena Bd. of Education v. Spangler, 427 U.S. 424 (96 S.Ct. 2697, 49 L.Ed.2d 599) (1976), or if they are imposed upon governmental units that were neither involved in nor affected by the constitutional violation, as in Milliken I, supra. Hills v. Gautreaux, 425 U.S. 284, 292-296 (95 S.Ct. 1948, 44 L.Ed.2d 448,) (1976). But where, as here, a constitutional violation has been found, the remedy does not "exceed" the violation if the remedy is tailored to cure the " 'Condition that offends the Constitution.' " Milliken I, supra, at 738 (, 94 S.Ct. 3112). (Emphasis supplied.)
 
 
 61
 The "condition" offending the Constitution is Detroit's De jure segregated school system, which was so pervasively and persistently segregated that the District Court found that the need for the educational components flowed directly from constitutional violations by both state and local officials.
 
 
 62
 In a word, discriminatory student assignment policies can themselves manifest and breed other inequalities built into a dual school system founded on racial discrimination. Federal courts need not, and cannot, close their eyes to inequalities, shown by the record, which flow from a longstanding segregated system.
 
 
 63
 Id. at 281-83, 97 S.Ct. at 2758-59.
 
 
 64
 After discussing a "pattern" of federal court decisions ordering ancillary relief over the past decade,[14] the Court concluded that "(p)upil assignment alone does not automatically remedy the impact of previous, unlawful educational isolation; the consequences linger and can be dealt with only by independent measures ". Id. at 287-88, 97 S.Ct. at 2761 (emphasis added). We consider such advice formidable legal support for the ancillary relief ordered in the present case. Nevertheless, although appellants' argument appears to be, at bottom, the same as that of petitioners in Milliken II that the remedial order exceeds the scope of the constitutional violations appellants contend that a critical difference between Milliken II and the present case is that in the former there was an express finding that the educational components at issue "were infected with the discriminatory bias of a segregated school system." Id. at 275, 97 S.Ct. at 2754. Indeed, the heart of appellants' challenge is their contention that there were no findings of discrimination in Delaware's present educational offerings.
 
 
 65
 First and foremost, we are not persuaded that Milliken II dictates that there be a finding that Each remedial program be "infected with the discriminatory bias of a segregated school system." Id. In fact, this finding was made as to only two of the four challenged programs in Milliken II. See id. at 274-75, 97 S.Ct. 2749, 2760. To read a general prescription into a decision which itself did not follow that purported prescription is a path we cannot follow. Further, there is an important practical reason that there cannot be such a finding for each remedial program many of them will not, and indeed cannot, come into existence until a desegregation plan is implemented. For example, programs in the areas of human relations, in-service training, and special counseling are intended to help students, parents, and faculty deal with the various pressures which arise As a result of desegregation. It would be logical fallacy to require findings of discrimination for programs which do not yet exist. That current programs, extraneous to the desegregation plan, are sufficient to meet other needs and may or may not be discriminatory, is simply irrelevant.
 
 
 66
 Finally, we note a troubling consistency between appellants' position on the ancillary relief issue and their position on who is to bear the burden of showing that the major relief ordered comports with the constitutional violations found. The plain fact is that the State never submitted any ancillary plans which would help students cope with the process of desegregation, even though much evidence had been presented that such plans were necessary. We believe that the incisive authority of Milliken II, the testimony presented in hearings before the district court, and the absence of objection to, or contradiction of, that testimony combine to indicate the critical importance of ancillary relief in this case.
 
 
 67
 Indeed, the district court specifically found that it is "amply supported and undisputed on the record" that "ancillary remedial relief is necessary and essential to accomplish the transition to unitary racially nondiscriminatory schooling and to overcome the vestige effects of De jure segregation in Northern New Castle County." 447 F.Supp. at 1014. It viewed the prescribed programs as "necessary to cure the constitutional infirmity and restore the victims of discrimination as nearly as possible to the position they would have assumed in the absence of a violation." Id. at 1017. These conclusions, if borne out in the record, are important indications that the guidance of Milliken II was considered and abided by.
 
 B.
 
 68
 Having determined that the district court could properly order ancillary relief, our function in this area devolves largely to the inquiry whether there exists adequate record support for the various concepts.[15] We are bound to uphold them if we find, as did the Milliken II Court, that "the decree before us was aptly tailored to remedy the Consequences of the constitutional violation." 433 U.S. at 287, 97 S.Ct. at 2761 (emphasis added). It is important to note one rather obvious "consequence" of the constitutional violations here: in September of this year, a comprehensive desegregation plan will be put into effect in the school system of New Castle County. Those "consequences" which are the self-evident problems arising from the De jure segregation of students are addressed, in large part, by the pupil reassignment plan. But other "consequences" of the constitutional violation, no less important, will arise by virtue of the desegregation itself. Again, it is only after a pupil reassignment plan has been put into operation that these programs may become an adjunct to, and assist in, the plan's effective implementation.
 
 
 69
 We shall address the various programs Seriatim, but we consider first State appellants' apparent concern that in ordering the ancillary relief programs, the district court co-opted an area better left to local and State administrators. Milliken II warned that "the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution," 433 U.S. at 280-81, 97 S.Ct. at 2757, but it also stated quite clearly that "(i)f . . . 'school authorities fail in their affirmative obligations . . . judicial authority may be invoked.' " Id. at 281, 97 S.Ct. at 2757, Quoting Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 1069 (1971). At no time did the State indicate that it would or could contrive the necessary ancillary programs. Simply put, we are hard pressed to see how state appellants can now invoke precepts of local autonomy when they failed to grasp their own opportunity to act in this regard. Under the circumstances, judicial authority was properly utilized. Characterizing its orders as "guidelines," the district court stated that "(t)he precise development and actual implementation of remedial relief is left to the discretion of educational authorities." 447 F.Supp. at 1015. See also id. at 1000. In that context, we undertake the task of evaluating the record evidence supporting the various programs.
 
 1.
 
 70
 In-service training. In-service training programs help to prepare the staffs of schools which will be receiving new students to cope with the special problems which arise as a result of the reassignment process. The district court's conclusion that "(a)dministrators, faculty, and other staff require orientation and training for desegregation," Id. at 1015, was supported by ample testimony from local administrators and nationally-known desegregation experts. For example, Dr. George V. Kirk, Superintendent of Schools in the Newark School District, testified that in "every meeting I've attended anywhere where desegregation has been attempted and where it has been successful, it is felt that (it is a) critical requiremen(t) for any plan to have good in-service programs underway for teachers, administrators and staff, even the cafeteria staff." Doc. 663 at A193-94.[16] Dr. Raymond O. Shelton, Superintendent of Schools in Hillsboro County, Tampa, Florida, stated that Tampa's in-service training program helped ameliorate problems "because some of (the staff) would be facing black youngsters for the first time and some of the black teachers would be facing white youngsters for the first time." Doc. 663a at B25. Numerous other experts testified to the need for in-service training, See, e. g., Doc. 596B at 529 (Dr. Thomas K. Minter, former Superintendent of Schools in Wilmington, testifying how staff can alleviate problems caused by transferring students); Doc. 596C at 725 Et seq. (Dr. Gordon Foster, Professor in the School of Education at the University of Miami, and Director of the Florida School Desegregation Consulting Center, explains form and purpose of in-service training); PX6 at 32 and Doc. 663J at I16, I39-41, I128-29 (Dr. Joseph E. Johnson, Superintendent of Schools in Wilmington); Doc. 663P at N11-13 (Dr. James B. Pugh, Superintendent of the Alexis I. duPont School District), and gave their personal opinion that the situation in Delaware warrants such a program. See e. g., Doc. 663B at Ba78 and Doc. 663C at 203 (Dr. Kirk); Doc. 663P at N60 (Dr. Donald L. Farrar, Alfred I. duPont School District's Director of Elementary Education: "I think a change as drastic as desegregation would require a great deal of in-service activity."); Doc. 663P at 30 (Dr. Pugh).
 
 2.
 
 71
 Reading and Communications Skills. Focusing on the guidance of Milliken II that "speech habits acquired in a segregated system do not vanish simply by moving the child to a desegregated school(;) (t)he root condition shown by this record must be treated directly by special training at the hands of teachers prepared for that task", 433 U.S. at 288, 97 S.Ct. at 2761, the district court determined that there was sufficient record evidence here to direct the New Board "to institute an affirmative reading and communication skills program which does not resegregate pupils." 447 F.Supp. at 1015-16. Plaintiffs' Exhibit 6, which was written under the supervision of Dr. Joseph E. Johnson, Superintendent of Schools in Wilmington, explained the necessity of such a program:
 
 
 72
 There is probably no educational component more directly associated with the process of desegregation than reading and communication skills. Children who have been educationally and culturally set apart from the larger community by the effects flowing from the longstanding interdistrict violation will inevitably acquire habits of speech, conduct, and attitudes reflecting their cultural isolation. They are likely to acquire speech habits and reading skills, for example, which vary from the environment in which they must ultimately function and compete if they are to enter and be a part of that community. This is not peculiar to race; it can affect any children who, as a group, are isolated from the main stream.
 
 
 73
 PX6 at 32-33. In his oral testimony discussing this exhibit, Dr. Johnson was asked what is necessary to implement an effective desegregation plan; he responded, in part, "I feel that there is very definitely a need . . . to look at the reading and communication skills of the individuals. . . ." Doc. 663J at I16. Further testimony regarding the general necessity of such a program came from both Dr. Foster, See Doc. 596C at 785-86, and Dr. Kirk. See Doc. 663C at pp. 204-06.
 
 3.
 
 74
 Curriculum. Holding that "curriculum offerings and programs must preserve respect for the racial and ethnic backgrounds of all students," the district court directed that "instructional materials, texts, and other curriculum aids should be free of racial bias" and instructed the New Board to "provide curriculum offerings and programs which emphasize and reflect the cultural pluralism of the students." 447 F.Supp. at 1016. There was testimony that it is necessary "to re-assess or assess the instructional program to determine the needs for a changing pupil population. . . ." Doc. 663P at N14 (Dr. Pugh). And in his testimony, Dr. Kirk agreed that it is vital to evaluate and attempt to make a curriculum racially nondiscriminatory, Doc. 663E at 89, and that "materials on the values of various groups and cultures in the group and cultures well beyond the group ought to be available to the young people." Doc. 663C at 206. See also PX6 at 33-34; Doc. 663J at I16 (Dr. Johnson).
 
 4.
 
 75
 Counseling and Guidance. The district court instructed that "to ameliorate the racial pressures on students undergoing desegregation and to prevent resegregation under the guise of curriculum or program choices, the NCCPBE must institute an effective and nondiscriminatory guidance program." 447 F.Supp. at 1016. Ample testimony described the various pressures to which reassigned students are subjected, See e. g., Doc. 596A at 274-77, 299-301 (Dr. Kenneth E. Madden, State Superintendent of Public Instruction); Doc. 596A at 526-29 (Dr. Minter), as well as the clashes which can arise as a result of these pressures. See Doc. 663A at B25 (Dr. Shelton: "(Y)ou are putting black and white youngsters together that had never been to school together before . . . there is a lot of understanding that needs to take place"). Dr. Kirk identified this area as "critical" to the "successful working of a desegregation plan to avoid the kinds of conflicts and problems that sometimes arise." Doc. 663 at A197. See also Doc. 596C at 786-87 (Dr. Foster); Doc. 663C at 206-07 (Dr. Kirk); PX6 at 34 and Doc. 663J at 16 (Dr. Johnson).
 
 5.
 
 76
 Selection of School Sites, Construction of New Buildings, Expansion of Existing Facilities, and Closing of School Buildings. As we have previously noted, regard for the existing physical capacities of the various school districts was of prime importance in the formulation of pupil reassignment plans. Of equally obvious importance is the nondiscriminatory maintenance or alteration in those capacities during the transition to one unified school district. Thus, the district court directed the New Board to "establish and enforce nondiscriminatory guidelines for new construction, review of building needs, and the appropriateness of each proposed building project or school closing." 447 F.Supp. at 1016. Various witnesses indicated that this area is critical to the successful implementation of the desegregation plan, See e. g., Doc. 663C at 207 (Dr. Kirk); PX6 at 34-35 and Doc. 663J at 16 (Dr. Johnson), and testimony adduced at the hearings indicated that it is necessary to establish guidelines for an orderly and nondiscriminatory effectuation of these projects. See e. g., Doc. 695S at 76 Et seq.; see also PX5 (admitted over objection) (in letter to Dr. Carroll W. Biggs, Superintendent of the Alfred I. duPont School District, Dr. Foster suggests that one necessary criterion for a desegregation plan is the "(e)quitable or proportionate burden for all racial or ethnic groups in such matters as closing schools . . . (and) selection of schools. . . .")
 
 6.
 
 77
 Human Relations Program. The district court directed the New Board to "provide an appropriate human relations program throughout the unitary school system in order to protect the individual dignity of students and teachers and to prevent racial myths and stereotypes from prevailing in schools undergoing desegregation." 447 F.Supp. at 1016. The existence of racial " myths" and "stereotypes" were mentioned at numerous points during the hearings, See e. g., Doc. 596C at 786 (Dr. Foster); Doc. 663A at B25 (Dr. Shelton), and various administrators testified as to their own successful experience with similar programs. For example, in describing Tampa's experience, Dr. Shelton said "(y)oungsters could get together and stand over here and stand there and refuse to go to class, or something, and the human relations people would get them back in class." Doc. 663A at 28. See also Doc. 663P at N33 (Dr. Pugh); Doc. 663C at 208 (Dr. Kirk: "(H)uman relations programs are an essential part of a desegregation process."); PX6 at 38.
 
 7.
 
 78
 Standards of Conduct. The district court directed the New Board "to develop a code of rights and responsibilities regarding such issues as student conduct and suspension and expulsion, and to insure administration of the code in an unbiased manner." 447 F.Supp. at 1016-17. The necessity of this program is poignantly illustrated in a remark by Dr. Kirk: "(O)ne of the things that seems to occur in the process of desegregation is the feeling on the part of both black and white youngsters that someone is being treated unfairly or someone is being given special conditions." Doc. 663C at 208; See also id. at 208-10. Other witnesses testified similarly to the relevance of such a program. See e. g., Doc. 663P at N62 (Dr. Farrar); See also PX6 at 38-39.
 
 8.
 
 79
 Racial Composition of Staff. In this area, the district court stated:
 
 
 80
 (I)ndependent of student assignment, the additional record ([17] made at hearings conducted after issuance of the primary remedial decree demonstrates that racial identity of schools can be perceived solely by reference to the racial composition of staff and existing staffs manifest substantial disparity in racial make-up. See e. g., PX18; ([18] Compare Swann, 402 U.S. at 18, 91 S.Ct. 1267. The New Board must reassign faculty, administrative, and other staff personnel in the course of eliminating the dual school system and the vestige effects of inter-district De jure segregation in order to insure that schools do not retain their former racial identity through racially identifiable faculty and staff assignments.
 
 
 81
 447 F.Supp. at 1017. The passage from Swann quoted by the district court offers clear support for its order in this regard. Stating that "policy and practice with regard to faculty (and) staff . . . (are) among the most important indicia of a segregated system," the Swann Court held that "where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff . . . a Prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown." 402 U.S. at 18, 91 S.Ct. at 1277. It bears particular note that the Swann Court rejected the contention that "the Constitution prohibits district courts from using their equity power to order assignment of teachers to achieve a particular degree of faculty desegregation." Id. at 19, 91 S.Ct. at 1277.
 
 
 82
 Thus, based upon the record evidence that the "racial identity of schools can be perceived solely by reference to the racial composition of (their) staff(s)," 447 F.Supp. at 1017, we are bound by the teachings of Swann to uphold this part of the order. Moreover, even taking the district court's language merely as an indication that the record has now been made more whole on the subject of staff employment,[19] we would affirm this guideline on the basis that ample testimony was adduced during the hearings which indicated a critical necessity for reassigned schoolchildren to have role models at their new schools. For example, Dr. Johnson testified:
 
 
 83
 (T)he fact that individuals with minority individuals who are successful in their field, who have the ability to master certain subject areas, (can come) into a school to give individuals new perceptions of what another race can do and how they can teach . . . I would characterize that as positive.
 
 
 84
 I would favor a concept that I think would be educationally sound and needed to have a smooth implementation of the desegregation plan, and that is for those youngsters who move into new situations (to) have role models that are of the same racial and ethnic background as they are . . . .
 
 
 85
 Doc. 663J at I124; Doc. 663L at K125. See also Doc. 596B at 502 Et seq. (Dr. Minter); Doc. 663C at 139, 209-31 (Dr. Kirk); PX6 at 39-41.
 
 C.
 
 86
 To sum up, we believe that in ordering ancillary relief as an adjunct to the pupil reassignment plan, the district court exercised an informed discretion. Each area of relief ordered was well-supported in the record, and the evidence of its value and necessity in the implementation of a successful desegregation plan in Northern New Castle County remains, even at this juncture, uncontroverted by the State appellants.
 
 V.
 
 87
 The Alexis I. duPont School District argues separately that it should not be included in the new plan. Its contention is based on the present racial composition of its schools: the school population is generally 78.5% White and 19.4% Black in New Castle County, and as of September 1977, the Alexis I. duPont School District consisted of 78.38% White students and 19.23% Black. Thus Alexis I. argues that it is now fully desegregated, that it need not be included in the plan, and that the district court erred by denying its motion to be excluded. On review our standard is the same as it is in the chief appeals a review of the district court's discretion. We find no misuse and accordingly will not disturb the ruling. This particular district is a portion of a larger geographic area determined by the three-judge court to be the subject of a substantial, longstanding inter-district violation. As stated earlier, See Part I Supra, the previous decision of this court determined that the geographic scope of the remedy was to include all the districts in Northern New Castle County except the district of Appoquinimink. That during a given month a discrete portion of this area the Alexis I. duPont School District exhibited a changed statistical profile by virtue of a voluntary effort is no guarantee that Alexis I.'s student population will remain the same. At any event, this in itself is insufficient reason for us to conclude that the district court misused its discretion, faced as it was with the prior inclusion of Alexis I. in the area to be reorganized.
 
 VI.
 
 88
 Finally, we turn to that part of the remedy that provides for local taxation. This is a most troublesome aspect of the district court's disposition of this case, in which a uniform tax rate was established to be applied throughout the desegregation area in order to "eradicate existing disparities and resultant inequities between present districts." 447 F.2d at 1025. The district court conferred on the New Castle County Planning Board of Education the authority to establish, levy and collect taxes for the current operating expenditures up to a maximum authorized rate of $1.91 per $100 of assessed property valuation. Id. at 1033. It indicated, however, that the Delaware Legislature could raise or lower this tax authorization as long as the rate was not lowered "below a generally acceptable rate to a point at which the desegregation process would be imperiled. . . . " Id. at 1026. Moreover, the court permitted the New Board to set a tax rate of up to $.32 for tuition, debt service, and minor capital improvements. Id. at 1027.[20]
 
 
 89
 Acknowledging the sensitivity of its actions, the district court commented:
 
 
 90
 Authorization to set a school tax rate is properly a product of the political process. For that reason, it is my view a federal court should not become involved failing a total abdication of responsibility over a period of time such that further delay significantly jeopardizes constitutional rights. . . .
 
 
 91
 . . . (T)he luxury of further delay comes at the cost of endangering an orderly transition to a racially nondiscriminatory unitary school system. . . .
 
 
 92
 It is with deep seated reluctance overcome only by the pressing, immediate necessity and the realization that no other option is available to fill the legislative void that the Court becomes involved at all in matters of taxation. Were it not true that the desegregation process faces imminent peril unaddressed by any other practical alternative, the federal court would not intrude. If the political process had provided statutory machinery or a procedure for devising a tax rate for the single district, or if there were not an immediate need to act now, I would further defer the matter of local tax rate authorization.
 
 
 93
 The Court is compelled, however, to order that a tax rate be established. This action is taken with the understanding that the Legislature can alter the parameters authorized. Because state political processes are preferred over even limited intervention by a federal court, the Delaware Legislature may raise or lower the tax authorization established here. The Court must caution, however, that any legislative action that lowers the established tax rate below a generally acceptable rate to a point at which the desegregation process would be imperiled will be received skeptically. Given the historical stance of the Legislature, if such a lowering occurs, the usual presumption of legislative regularity will not attach. If, as an alternative, the Delaware Legislature makes provision for replacement of the authorized revenue lost through reduced local school tax rates, the local school tax rate can be lowered to any level or even eliminated.
 
 
 94
 447 F.Supp. at 1025-26 (footnotes omitted) (emphasis added).
 
 
 95
 Pursuant to the district court's instructions, the NCCPBE on February 23, 1978, established a tax rate for current operating expenses of $1.68, a rate to be described in the district court's May 5, 1978, Opinion, --- F.Supp ----, as "within the guidelines sanctioned by the Court's order." May 5 Opinion at ----. At about the same time, however, the Delaware General Assembly passed, and Governor Pierre S. du Pont IV signed into law, Senate Bills 456 and 457; S.B. 456 "directed the State Board of Education to devise an alternative plan of governance," and S.B. 457 directed the State Board to set a maximum tax rate for each new school district so devised. On March 16, 1978, the district court enjoined the implementation of a four-district plan contrived as a result of S.B. 456,[21] and shortly thereafter, the State Board calculated a tax ceiling for the single district at a rate lower than that established by the NCCPBE. Eventually set at $1.585, or 91/2 cents lower than the NCCPBE's rate, the State Board's rate would yield expected revenues roughly.$2.5 million less than the $1.68 rate.[22] See May 5 Opinion at ----.[23]
 
 
 96
 In light of the variance in tax rates, the State Board applied to the district court for an injunction to permanently enjoin the NCCPBE from fixing, levying or collecting a local tax for current operating expenses in excess of that established under State law. After a three-day hearing and the submission of post-trial briefs by various parties, the district court on May 5, 1978, denied the injunction on the ground that S.B. 457 as implemented by the State Board provided "a taxation scheme likely to frustrate or imperil the desegregation process in the single school district." May 5 Opinion at ----.[24] The State of Delaware sought immediate relief in this court by filing a petition for mandamus directing the district court to vacate its order of May 5, 1978, and to enter the injunction requested by the State Board. Because the subject matter of the mandamus petition implicates a critical issue of this appeal, we have consolidated the mandamus request with the appeals already before us.
 
 A.
 
 97
 " Courts of appeals, pursuant to their supervisory powers, may review in a mandamus proceeding questions of unusual importance necessary to the economical and effective administration of justice. Schlagenhauf v. Holder, 379 U.S. 104 (, 109-12, 85 S.Ct. 234, 13 L.Ed.2d 152) (1964); La Buy v. Howes Leather Co., 352 U.S. 249, 259-60(, 77 S.Ct. 309, 1 L.Ed.2d 290) (1957). See Will v. United States, 389 U.S. 90, 107(, 88 S.Ct. 269, 19 L.Ed.2d 305) (1967)." In re Grand Jury Subpoenas, 573 F.2d 936, 940-41 (6th Cir. 1978). For several important reasons, we believe that the present case merits use of this exceptional writ. First, the establishment of a taxation scheme for a new, court-created school district is an act of unique import, qualifying the matter for consideration under a device "reserved for really extraordinary causes." Platt v. Minnesota Mining and Mfg. Co., 376 U.S. 240, 245, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964). Second, because the subject matter of the mandamus action is inexorably intertwined with an important aspect of the opinions and orders presented for our review in the consolidated appeals, it would be an act of sheer sophistry to review the merits of the court's prior tax rate determinations without taking into consideration the subsequent act of the Delaware legislature and the additional court action of May 5 on the same subject. And finally, because the issue is neatly framed both by the briefs in the main appeals and in those supporting and opposing the mandamus request,[25] no additional purpose would be served by denying a review on the merits now; the demands of economical and effective administration of justice can be satisfied without prejudice to the rights of any interested party.
 
 
 98
 We are cognizant that the writ of mandamus is not to be used as a substitute for appeal. Ex parte Fahey, 332 U.S. 258, 259-60, 67 S.Ct. 1558, 91 L.Ed. 2041 (1947).
 
 
 99
 On direct appeal, a court of appeals has broad authority to "modify, vacate, set aside or reverse" an order of a district court, and it may direct such further action on remand "as may be just under the circumstances." 28 U.S.C. § 2106. By contrast, under the All Writs Act, 28 U.S.C. § 1651(a), courts of appeals may issue a writ of mandamus only when "necessary or appropriate in aid of their respective jurisdictions."
 
 
 100
 Will v. Calvert Fire Insurance Co., --- U.S. ---, ---, 98 S.Ct. 2552, 2557, 57 L.Ed.2d 504 (1978) (Opinion of Justice Rehnquist). We are persuaded that, for the above stated reasons, to entertain the present petition is to aid our clear jurisdiction to determine the taxation issue presented on direct appeal. To entertain this petition is simply to consider additional matters not only relevant and germane to the issue on appeal, but absolutely critical to an intelligent disposition of it. As we consider the mandamus petition, however, we recognize the extremely narrow precedential effect of our action and reaffirm our fealty to the general rule that writs of mandamus are not substitutes for direct appeals, but rather are traditionally used in the federal courts only "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." Will v. United States, 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305 (1967), Quoting Roche v. Evaporated Milk Assoc., 319 U.S. 21, 26, 63 S.Ct. 938, 87 L.Ed. 1185 (1943).
 
 B.
 
 101
 In a matter fraught with much emotion, the question of taxation understandably has generated heated community interest. Where, as here, a tax rate has been imposed by a court as an important aspect of its desegregation decree, there occurs a tension between two venerable maxims of the American tradition: "Taxation without representation is tyranny" becomes the banner of some of those who are to be taxed, while the district court, safeguarding the effective implementation of its order, is deeply cognizant of the venerable phrase that "the power to tax involves the power to destroy."[26] The district court sought an accommodation between these noble concepts balancing the right of the people to be taxed in accordance with a "politically" formulated rate against its own duty to ensure that the desegregation plan not be aborted by that taxation schema. Without reaching the merits of its decision, however, we have concluded that the May 5, 1978, determination must be reversed for a new hearing because of what we perceive to be a fundamental error in the conduct of the hearing for a permanent injunction.
 
 
 102
 True to the statement in its January 9, 1978, opinion that "the usual presumption of legislative regularity will not attach," 447 F.Supp. at 1026, the district court approached the injunction hearing without extending the requisite deference to which legislative judgments in the field of taxation are entitled. The district court did recognize the precepts announced in San Antonio Independent School District v. Rodriquez, 411 U.S. 1, 42, 93 S.Ct. 1278, 1301, 32 L.Ed.2d 16 (1973):
 
 
 103
 The very complexity of the problems of financing and managing a state-wide public school system suggests that "there will be more than one constitutionally permissible method of solving them," and that, within the limits of rationality, "the legislature's efforts to tackle the problems" should be entitled to respect. Jefferson v. Hackney, 406 U.S. (535, 546-47, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972)).
 
 
 104
 But weighing these precepts against what it called "(t)he inherent power of a court to take whatever steps are required to fashion an effective desegregation decree," May 5 Opinion at ----, the court jettisoned "the usual presumption of deference to a legislature in taxation matters." Id. We are persuaded that in so doing, the court overstated its power to fashion, and insure implementation of, an effective decree. For while it is true that the court specifically recognized that "deference . . . does not mandate acceptance," Id., and while we agree that this particular formulation is a proper statement of the governing precept, we are convinced that the court failed to afford Any deference to the legislative action. At best, the legislative solution was received as a neutral narrative fact; at worst, it was received with suspicion, subject to a condition that Delaware prove its regularity and constitutionality.
 
 
 105
 Properly, Delaware's statutory solution to the vexing taxation problem should have been received with the presumption of regularity and constitutionality mandated clearly and unequivocally by the teachings of the Supreme Court. Although the district court did not base its decision on the constitutionality of the state taxation scheme, See note 24 Supra, the remedy in this case is the vehicle to cure constitutional violations. Therefore, it is not inappropriate to analogize Supreme Court teachings relating to the deference to legislative action where the issue of constitutionality is directly implicated. For example, in Madden v. Kentucky, 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84 L.Ed. 590 (1940), the Court stated:
 
 
 106
 (I)n taxation, even more than other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and aggressive discrimination against particular persons and classes.
 
 
 107
 This language was repeated in San Antonio Independent School District v. Rodriquez, supra, 411 U.S. at 40-41, 93 S.Ct. 1278, 1300, with the prefatory comment: "This Court has often admonished against such interferences with the State's fiscal policies under the Equal Protection Clause." In Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 510, 57 S.Ct. 868, 872, 81 L.Ed. 1245 (1937), the Court explained how the presumption vindicates traditional notions of separation of powers:
 
 
 108
 A state legislature, in the enactment of laws, has the widest possible latitude within the limits of the Constitution. In the nature of the case it cannot record a complete catalogue of the considerations which move its members to enact laws. In the absence of such a record courts cannot assume that its action is capricious, or that, with its informed acquaintance with local conditions to which the legislation is to be applied, it was not aware of facts which afford reasonable basis for its action. Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.
 
 
 109
 And if other cases fail to explicate so clearly the rationale behind the presumption, it is only because the presumption is so impervious to alteration. See e. g., McGowan v. Maryland, 366 U.S. 420, 425-26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) ("State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality."); Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 526, 79 S.Ct. 437, 440, 3 L.Ed.2d 480 (1959) ("The States have a very wide discretion in the laying of their taxes.") See also Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973). Moreover, it must be noted that United States v. Missouri, 515 F.2d 1365 (8th Cir. 1975) (in banc), relied upon by the district court, did reverse the district court's imposition of a tax rate insofar as that rate exceeded one which was represented as adequate by state officials.
 
 
 110
 Under these precepts, in the proceedings to enjoin the operation of the rate set by the NCCPBC, the legislative solution should have been received by the district court with a presumption of regularity and constitutionality. Absent the proper presumption, the State Board's ability to make a strong showing on the merits a requisite in any injunctive action was improperly skewed. Accordingly, we will direct the district court to vacate its order of May 5, 1978, and to conduct a new hearing in accordance with the foregoing. Given the unusual posture of these proceedings, we further direct that the district court enter an order preliminarily enjoining a tax rate of $1.68 for current operating expenses and affirmatively imposing a tax rate of $1.585 until a final order on the request for a permanent injunction is entered. In this regard, we cannot emphasize strongly enough that nothing in our disposition of this issue is intended to interfere with the implementation of the desegregation plan in Northern New Castle County this September. To the extent that the State legislature may discover that the State Board's determination of priorities in setting the rate of $1.585, See Section VI C Infra, must be altered, it may legislate a change retroactively.
 
 C.
 
 111
 Although it is unnecessary for us to pass on the merits of the district court's May 5 taxation ruling, we nevertheless are compelled to highlight some points which may assist the court in its further proceedings and which, although self-evident, may have been relegated to an undeserved background position in the prior proceedings.
 
 
 112
 The district court was apparently and understandably concerned that, if set below a certain level, the State-authorized tax rate will prevent the effective implementation of the desegregation plan. Numerous times in its May 5 opinion, the court expressed concern that the State-approved budget did not reflect an Increment to the normal operating budget sufficient to meet desegregation needs.[27] Our observation is that this overlooks the critical, and incontrovertible, proposition that any money budgeted by the State to the Northern New Castle County school system must be used by the NCCPBE, First, to effect the desegregation order, and then to meet the expenses of other programs. Put another way, it is the NCCPBE's responsibility to work with the money it has by attending first to all aspects of the remedial order, and then to other aspects of the school system's expenses. The Board has much discretion in setting the priorities within the latter group, but none as to the former.
 
 
 113
 For example, and only by way of illustration, the school authorities may decide to curtail certain extracurricular school programs which fall outside the area mandated by the court's desegregation order, so as to remain within budgetary limits. If any or all of these programs need be cut completely from the budget, this will occur as a result of the Legislature's judgment, not the court's. The legislators who passed S.B. 457 were well aware of the remedial order which will go into effect this September. We must assume not only their ability to compute what the mandatory expenses would be, but also their good faith in so doing.[28] Cognizant of what the State Must pay by way of implementing the desegregation plan before using money for other purposes, the legislators arrived at an amount which may or may not imperil other Non -Court-ordered aspects of the New Castle County school system. As the Supreme Court stated in Carmichael v. Southern Coal and Coke Co., supra, 301 U.S. at 510, 57 S.Ct. at 872, "(the legislators) cannot record a complete catalogue of the considerations which moved (them) to enact (the law)." But given the nature of our political system, these legislators will most certainly receive feedback from the electors to whom they are accountable as to whether they have made the right choices.[29] Thus, without detracting from the importance of a federal court's duty to ensure that its remedial decrees be effected properly and wholly, we suggest that there are obvious inherent political safeguards involved in this case which should be permitted to run their own course.
 
 
 114
 It also bears emphasis that these observations are based on a factual complex in which the difference between the State rate and the court rate amounts only to.$2.5 million in a package designed to produce school tax revenues of approximately $40 million. In the extreme case, obviously not present here, if the State had allocated only $8 million for court-ordered programs, and no funds, or substantially insufficient funds, to operate the remainder of the school system, such action by the State would clearly be unacceptable as interfering with the operations of the desegregation decree. See Griffin v. County School Board, 377 U.S. 218, 233-34, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1969). The balance, as always, should be struck, in the first instance, by the trial court.
 
 VII.
 
 115
 That the district court retains supervisory jurisdiction until the transition to a unitary school system is completely effectuated,447 F.Supp. at 1039, should not be construed as a change of emphasis that the primary responsibility for public education in Delaware rests with the State government and its subdivisions. Operating a nondiscriminatory school system is the responsibility of the State and not the federal court system. We detect nothing in the district court's opinion that ousts the State of Delaware from that primary responsibility. That the plan submitted by the State in 1977 pursuant to our mandate was properly rejected by the court should not deter the State Board of Education from working directly with the district court in efforts to eliminate "the vestige effects of pervasive De jure inter-district segregation." Id. at 1011.
 
 
 116
 The court-ordered plan which we have reviewed in this appeal was promulgated only because the State, through its legislature or its board of education, failed to come forward with a suitable plan. State authorities are still invited, nay, urged, to come forward with meaningful solutions to this vexing problem, solutions that will achieve the same objectives as the court-ordered plan. Continued criticism, organized or otherwise, formal or informal, of the plan ordered by the federal courts as a last resort, is an insufficient and ill-advised response to the void caused by State inaction.
 
 
 117
 In the appeals at Nos. 77-2336, 2337, 2338 and Nos. 78-1143, 1144, 1145, 1146, 1147 and 1148 the orders of the district court will be affirmed.
 
 
 118
 In the mandamus action at No. 78-1743, the writ will be granted in accordance with the discussion in Part VI, Supra.
 
 
 
 [1]
 We establish here only that the remedy which we order may include the suburban districts, because their existence and their actions were part of the violations which lead to the remedy
 
 
 [416]
 F.Supp. at 341 n.43
 
 
 [2]
 The latter included plans relying on voluntary transfer inducement ("magnet" plans), 416 F.Supp. at 345-46, and several proposals utilizing cluster and pairing techniques, Id. at 346-48, which the court determined to be "fraught with complex problems unsuitable for judicial determination" and which would "place the Court in the ongoing position of general supervisor of education in New Castle County." Id. at 347
 
 
 [3]
 This area is presently comprised of the Alfred I. duPont, Alexis I. duPont, Claymont, Conrad, DeLaWarr, Marshallton-McKean, Mount Pleasant, Newark, New Castle-Gunning Bedford, Stanton, and Wilmington School Districts
 
 
 [4]
 Although Judges Rosenn, Hunter, and Garth dissented when this case was previously before us on the ground that the inter-district violations had not been identified, 555 F.2d at 383-86, they believe that our in banc decision is now the law of the case and that institutional integrity requires respect for the rule previously announced by the majority
 
 
 [5]
 The proposal was described by the district court as follows:
 As part of this process, attendance zones are to be drawn in the City of Wilmington corresponding to the various suburban districts. In effect, for purposes of pupil assignment, each attendance zone would be part of the suburban district to which the Wilmington students residing therein would be assigned. . . .
 As noted earlier, the proposal permits any student to elect to remain at his or her present school. Testimony given at the hearings indicated that for the 1977-78 school year, a student would have between ten and twenty days prior to the opening of school to decide whether to transfer back to his or her Wilmington school. Thus, the choice would have to be made without the benefit of having attended the suburban school, perhaps without even having visited it, and, if assigned to a suburban district with several schools serving the same grade level, without knowing the exact school within the district to which assignment would be made. For those who elect to accept their suburban assignments, they may revoke their choice by submitting a form prior to April 30, 1978. These students would then return to their Wilmington schools for the 1978-79 school year.
 Evans v. Buchanan, 435 F.Supp. 832, 838-39 (D.Del.1977) (footnotes omitted).
 
 
 [6]
 Delaware law had long provided for voluntary transfers between the Wilmington district and three suburban districts Alfred I. duPont, Alexis I. duPont and Mount Pleasant but few transfers had actually taken place because the statute required the approval of both the sending and receiving districts. Del.Code tit. 14, § 603. Following the July 15, 1976, remedy order of the three-judge court, the state legislature expanded the right of transfer to include all eleven districts and eliminated the requirement of approval by the sending district. 60 Del.Laws, Ch. 486. In 1977 the legislature acted again, this time limiting the restrictions on accepting the transfers and directing the Board of Education affirmatively to promote the concept in all eleven districts. 61 Del.Laws, Ch. 32; 61 Del.Laws, Ch. 67
 The Delaware State Board of Education maintains that "(this) legislative voluntary transfer plan was a response to the order of this Court and the prior order of the three-judge Court." State Appellants' Brief at 10.
 
 
 [7]
 The district court noted that uncontroverted testimony from State Board of Education personnel established that "no white student, suburban or city, would be assigned to a different school district, but every black student in Wilmington would be reassigned." 435 F.Supp. at 840-41
 Dr. Thomas K. Minter, former Superintendent of Schools of the Wilmington School System, was questioned during the hearings on the State's proposal as to his reaction to this aspect of the plan. Characterizing the plan as "patently discriminatory," he responded as follows:
 I think it's insulting to the parents and to the students of Wilmington because they are again the victims. . . . In undoing the situation, if you put the burden of the remedy on those who have been victimized, it appears to me that the majority society is again putting the burden for it's almost saying "Go out and heal yourself." . . . (W)hen the burden is equally shared, it seems to me that it recognizes the duty of the total society to rectify a wrong, and not just the victims.
 Doc. 596 B at 494-96.
 
 
 [8]
 The two predominantly black districts of Wilmington and DeLaWarr contain in the aggregate far less student population and, consequently, far less building capacity than the aggregate student population and building capacity of the nine predominantly white districts. Accordingly, plaintiffs accept that under any desegregation plan "black children on the average will be reassigned to (what will be formerly racially identifiable) white schools a greater number of years than white children will be reassigned to (what will be formerly racially identifiable) black schools."
 
 
 [447]
 F.Supp. at 994, Quoting Doc. 668 at 7 (footnotes omitted)
 
 
 [9]
 The concept of 10-2 was generated by multiplying the 21.7% Figure for black students in the affected area by twelve grades to determine that 2.6 was the number of grades requiring white reassignment in order to produce a "complete mix." Having arrived at a number closer to three than two grades, the New Board arbitrarily chose to assign children from predominantly white districts the lesser number of two years. thereby requiring the reassignment of children from predominantly black districts for ten years rather than nine
 
 
 [447]
 F.Supp. at 1002 (footnotes omitted)
 
 
 [10]
 Contrasting the 10-2 and 9-3 plans, the court stated:
 Apart from the question of capacity, neither the New Board nor defendants State Board and intervening districts have advanced any reasons why a 9-3 concept ought not to be successfully implemented in the desegregation area. Nor has it been shown that if a capacity problem of minor dimension exists, a slight departure from 9-3 is sufficiently deleterious to justify a wholesale embracing of 10-2. . . .
 It is important to realize at the outset that unlike the affected areas in other reported desegregation cases, Northern New Castle County contains no dearth of school spaces. To the contrary, declining enrollments have resulted in a surplus of seats in all districts such that absent any desegregation order the need to consider closing some schools is abundantly evident. Under the 10-2 assignment plan, severe underutilization of city schools identified the Wilmington schools as ready targets for closing. Under a 9-3 assignment plan, most if not all of the Wilmington and DeLaWarr schools are actively utilized and would probably remain open. In contrast to the devastating impact of the 10-2 plan on the degree of utilization of schools in the predominantly black districts, however, the 9-3 concept contemplates only minor adjustments in the use of the schools in the predominantly white districts, reducing their utilization from a current figure of 70% To 67%.
 Id. at 1005-06.
 
 
 [11]
 A summary of these violations has been suggested as follows:
 (T)he district court identified Eight separate interdistrict violations, Viz., 1. the enactment of (the) Educational Advancement Act of 1968 (EAA), 2. (t)he location of public housing projects, 3. state subsidies for the interdistrict transportation of students attending private schools, 4. the establishment by the Wilmington school board of optional attendance zones, 5. the recordation of deeds containing racially restrictive covenants, 6. portions of the Federal Housing Administration's mortgage underwriting manual, 7. portions of the Delaware Real Estate Commission handbook, and 8. the interdistrict transportation of students attending all-black or all-white schools prior to Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).
 Evans v. Buchanan, 555 F.2d at 384 (Garth, J., dissenting) (footnotes omitted).
 A more generally phrased, but similarly acceptable, characterization has been made by the district court:
 The court concluded that an inter-district remedy would be appropriate, based on its findings that:
 1) there had been a failure to alter the historic pattern of inter-district segregation in Northern New Castle County;
 2) governmental authorities at the state and local levels were responsible to a significant degree for increasing the disparity in residential and school populations between Wilmington and the suburbs;
 3) the City of Wilmington had been unconstitutionally excluded from other school districts by the State Board of Education, pursuant to a withholding of reorganization powers under the Delaware Educational Advancement Act of 1968.
 
 
 [424]
 F.Supp. at 877 (footnote omitted)
 
 
 [12]
 The State Board of Education generally does not dispute the proposition that compensatory programs such as those imposed by the (district court) can be of assistance in the desegregation process
 State Appellants' Brief at 27.
 (T)he evidence which plaintiffs offered consisted of the opinions of educators that the enriched educational offerings sought would be educationally desirable in the context of converting from eleven separate school districts to a single desegregated district or that such matters should not be ignored in the process of effecting that conversion. It is to be doubted whether any professional educator would ever opine to the contrary. . . .
 State Appellants' Reply Brief at 27-28.
 
 
 [13]
 Only the State appellants challenge the propriety of the ancillary relief on appeal. The State Board contends that the suburban districts lack standing to agree or disagree with the programs, since these districts will cease to exist under the court's order. In view of our rejection of the State Board's claims, we need not resolve the question of standing
 
 
 [14]
 433 U.S. at 283-86, 97 S.Ct. 2749. While the Court indicated that its reference to these cases was not necessarily tantamount to approval of their holdings, the cases were used to "demonstrate that the District Court in the case now before us did not break new ground . . ." Id. at 286-87, 97 S.Ct. at 2760
 State appellants call our attention to a Tenth Circuit case in which the court Declined to approve the district court's order of both an ancillary bicultural-bilingual education plan and a consolidation of two schools into a campus complex. Keyes v. School District No. 1, Denver, Colorado, 521 F.2d 465 (10th Cir. 1975), Cert. denied, 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976), came down before the Supreme Court indicated its strong support for ancillary relief in Milliken II. More important, the Keyes court was presented with problems which are not relevant to our situation. As to the bilingual program, it stated that "the court's order would impose upon school authorities a pervasive and detailed system," 521 F.2d at 482; as to the consolidation plan, it stated that "the (district) court appears to have acted solely according to its own notions of good educational policy unrelated to the demands of the Constitution", Id. at 483. As discussed more thoroughly below, we believe that the district court in the present case allowed maximum room for local authorities to contrive and implement their own programs, and that the court did not impose its own views of what is "good" in the educational context in the absence of record evidence.
 
 
 [15]
 Initially, we note that we are unimpressed with appellants' characterization of the evidence relied upon by the district court as "Merely . . . the statements of educators that the programs in question were matters of legitimate concern and were educationally desirable in the desegregation process." State Appellants' Brief at 26-27 (emphasis added). The educators included local administrators and nationally known desegregation experts, all of whom were in some way intimately knowledgeable of the situation in the Delaware school system. The Milliken II Court had no difficulty in crediting similar testimony. See 433 U.S. at 273, 273-74 n.9, 97 S.Ct. 2766
 
 
 [16]
 Dr. Kirk later added that there is a "tremendous need" for in-service preparation, "particularly in an area like this where there are eleven separate districts, where many of these teachers have never worked together . . . ." Doc. 663B at Ba 78
 
 
 [17]
 In a footnote here, the district court noted that the three-judge court had previously stated that it had "no figures in the record to indicate whether there is a substantial disparity in racial makeup of existing staffs." 447 F.Supp. at 1017 n.148, Citing 416 F.Supp. at 359
 
 
 [18]
 See also Doc. 663J at I4-5; Doc. 663H at 208-16
 
 
 [19]
 We note that the district court rejected appellees' proposed inclusion of two additional provisions, "one requiring review of past hiring and promotion policies of the existing districts and appropriate actions to overcome the continuing effects of any past discrimination, and the other prohibiting any decrease in the percentage of minority employees . . . ." 447 F.Supp. at 1017 n.149
 
 
 [20]
 In a subsequent clarification of its January 9th opinion and order, the district court limited the operation of the maximum rates in these three areas to the fiscal year beginning July 1, 1978. Thereafter, the NCCPBE was authorized to set the rates. See Evans v. Buchanan, Nos. 1816-22 (D.Del., Jan. 20, 1978), Slip Opinion at 4
 
 
 [21]
 In its May 5th opinion, the district court explained that the four-district plan "conflicted with the January 9, 1978 order of the Court," May 5 Opinion at ----, a characterization "reluctantly conceded by representatives of the State defendants." Evans v. Buchanan, Nos. 1816-1822, --- F.Supp. ----, at ---- (D.Del., June 22, 1978). The injunction is not contested here
 
 
 [22]
 The district court has summarized the procedure by which S.B. 457 authorized the State Board to calculate a tax rate as follows:
 The legislation directs the State Board to: (1) estimate fiscal 1978 current expenditures; (2) divide this figure by the number of students enrolled for fiscal year 1978 to calculate a current average per pupil expenditure; (3) multiply the average expenditure total by the number of students expected to attend in fiscal 1979 to establish an estimated expenditure required for fiscal year 1979; (4) using the current total assessed value of taxable real estate establish a tax rate that would yield 110% Of the 1979 estimated expenditure. Although providing that the 110% Amount so obtained included delinquencies and the costs of collection, the statute is silent on whether the 10% Is also intended to cover the costs of reorganization and desegregation or is simply an inflation factor reflecting the historic percentage of increase in total expenditure. Finally, the statute provides that the Board of Education (NCCPBE) rather than the State Board may set the tax rate for debt service, minor capital expenditures and tuition.
 May 5 Opinion at ---- - ----.
 
 
 [23]
 The State Board represented that its tax rate will yield $39,873,626; the court noted that assuming the historical collection rate of 98.5%, a tax of $1.585 will actually yield $39,275,251. Id. at ---- - ----
 
 
 [24]
 The district court offered the following reasons why "the desegregation process . . . (would) be imperiled by reason of the $1.585 current expense tax rate":
 (1) Based upon historic levels of local support, the yield available for public education in the desegregation area from the $1.585 tax rate is less than the projected total aggregate local expenditure for school children which would have been made by the eleven component districts in the absence of reorganization and desegregation; (2) No provision was made for local current operating tax revenue to enable the NCCPBE to meet essential expenses incidental to reorganization and desegregation; (3) S.B. 457 as construed and as procedurally presented in the form of a motion for permanent injunction by the State Board would establish for all practical purposes the $1.585 limit in perpetuity notwithstanding that inflation is a fact of life and an outstanding January 9, 1978 order of this Court requires the NCCPBE to pay fifty percent of the costs of desegregation commencing in fiscal year 1980 and increasing ten percent each year thereafter; and (4) the State Board in adopting the $1.585 rate predicated the same upon an assumption which is invalid under State law.
 Id. ---- - ----.
 In its petition for mandamus in this court, the State observes: "While the district court does not use the term 'unconstitutional' in its opinion, its conclusions that S.B. 457 'must be rejected' (Opinion, p. 8) (,) 'may be invalidated' (Opinion, p. 15), and that a federal court has authority to 'strike down impediments . . . to an appropriate (desegregation) remedy' (Opinion, p. 12), compel this conclusion." Petition at 5 n.1. However, in its latest opinion, the district court has clearly explained that "(t)he constitutionality of S.B. 457 was not reached," June 22 Opinion at ---- n.1, and that the court's "conclusion" in its May 5 opinion and order was that "the State Board failed to make the showing required to justify a permanent injunction of any tax rate in excess of the $1.585 figure." Id. at ----. In light of our disposition of the mandamus request, it is unnecessary for us to address these varying interpretations.
 
 
 [25]
 By order dated June 6, 1978, we permitted any party interested in the main proceedings to file an answer to the mandamus petition
 Appellees confined their response to the mandamus petition almost exclusively to an attack on the State's standing to seek the writ. Although the State was not a party to the proceedings below, it argues that it has standing "to vindicate, on behalf of Delaware and its citizens, core principles of federalism," and that "(o)nly the State, as an entity, can bring an action designed solely to protect the integrity of the constitutionally-protected taxing function of a State . . .." Petition at 2, 8. While it may appear that the better course would have been for the State to move to intervene for purposes of appeal, we agree with a critical distinction raised in the State's petition: those named parties which may appeal the May 5 judgment pursuant to 28 U.S.C. § 1291(b) (including the State Board), are primarily concerned with the formulation of the actual tax rate that will go into effect; the State of Delaware, while obviously sharing this concern, directs its Mandamus petition toward its unique interest in the approach taken by the district court in its handling of S.B. 457. Under these exceptional circumstances, in which principles of federalism are sought to be vindicated by a State nonparty whose declared interest differs from those of other parties in the main appeals, we believe the State properly has standing.
 
 
 [26]
 McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819)
 
 
 [27]
 See e. g., May 5 Opinion at ----, ----:
 One can . . . say with some assurance that when less is spent on education during the first year of desegregation than would have been spent absent desegregation, the effort to desegregate is threatened if not imperiled.
 To embark on the long overdue course of desegregation with funds which, if minimally sufficient to satisfy operating costs for one year, are inadequate to meet the actual costs of desegregation and reorganization is to invite disaster.
 
 
 [28]
 Indeed, in earlier hearings before the district court, the State Board of Education's attorney gave explicit recognition to the parameters of the State's good faith efforts. Contending that "the Legislature is ultimately the body which can . . . say . . . what tax rates are going to be," he conceded "that the Legislature (does not have) the right to frustrate a Federal Court decree," and that "it is never too late for the Democratic Legislature of this State to take constitutional action insofar as it doesn't unconstitutionally interfere with a proper order of this Court." Doc. 663Q at O-166, O-168, O-169-70
 
 
 [29]
 Under S. 457, the NCCPBE "may annually set a tax rate for current operating expenses not greater than (the) maximum rate (set by) the State Board." Although we share the district court's observation that this does not seem to take into account such factors as inflation, See note 22 Supra, again we are constrained to note that the populace's reaction to the increasingly pared-down budget which may result from this provision will be properly directed to the State Legislature