George ARTHUR, et al.,
Plaintiffs-Appellees,

and

Community Advisory Board for Bilingual Education of Buffalo, et al., Plaintiffs-Intervenors-Appellees,

v.

Ewald P. NYQUIST, Individually and as Commissioner of Education of the State of New York, et al., Defendants,

James D. Griffin, Mayor of the City of Buffalo, et al., Defendants-Appellants.

No. 1037, Docket 82–7690.

United States Court of Appeals, Second Circuit.

Argued April 6, 1983.

Decided July 22, 1983.

J. Edmund De Castro, Jr., Buffalo, N.Y. (Jaeckle, Fleischmann & Mugel, Buffalo, N.Y., on the brief), for plaintiff-intervenor-appellee Community Advisory Bd. of Bilingual Educ. of Buffalo.

Bruce A. Goldstein, Gerald P. Seipp, and Serotte, Reich & Goldstein, Buffalo, N.Y., submitted a brief for plaintiff-intervenors handicapped children.

Frank G. Raichle, Buffalo, N.Y. (Arnold Weiss, Raichle, Banning, Weiss & Halpern, Buffalo, N.Y., on the brief), for defendants-appellants Mayor and Common Council of Buffalo.

Thomas I. Atkins, Gen. Counsel, N.A.A.C.P., Brooklyn, N.Y. (Jay, Klaif & Morrison, Buffalo, N.Y., on the brief), for plaintiffs-appellees.

Aubrey V. McCutcheon, Jr., Sp. Counsel to Corp. Counsel, Buffalo, N.Y. (James J. McLoughlin, Acting Corp. Counsel, William E. Carey, Asst. Corp. Counsel, Buffalo, N.Y., on the brief), for defendant-appellee Buffalo Bd. of Educ.

Before KAUFMAN, TIMBERS and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

This appeal and a companion matter decided this day, No. 82–7802, concern the propriety of remedies ordered by the District Court for the Western District of New York (John T. Curtin, Chief Judge) as part of continuing efforts to eliminate the deliberate racial segregation previously found to have existed in the public school system of Buffalo, New York. In this appeal the Mayor and the Common Council of Buffalo

(the "City defendants") appeal from Chief Judge Curtin's August 27, 1982, order requiring the City defendants to provide the Buffalo Board of Education $7,400,000 prior to June 30, 1983, in addition to the $150,629,822 appropriated by the City defendants to the Board for the 1982–83 school year. Though we believe a more detailed justification for the additional funds could usefully have been required by the District Court and should be required in the event that additional sums beyond appropriated funds are sought for subsequent school years, we affirm Chief Judge Curtin's order.

In 1976 the Buffalo public school system was found to have been deliberately segregated along racial lines, and liability for this unconstitutional conduct was imposed upon the then current members of the Board of Education and the Common Council, and the then incumbent mayor. *Arthur v. Nyquist,* 415 F.Supp. 904 (W.D.N.Y.1976), *aff'd in relevant part,* 573 F.2d 134 (2d Cir.), *cert. denied sub nom. Manch v. Arthur,* 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978). Implementation of a remedy has proceeded in stages as Chief Judge Curtin has wisely imposed upon the School Board the primary responsibility to fashion means of eliminating all vestiges of a segregated system of public education. In the 1976–77 school year, Phase I was implemented with the closing of ten schools and the opening of two magnet schools. Phase II, implemented at the start of the 1977–78 school year, called for the opening of eight more magnet schools. In June 1979 the District Court ordered complete desegregation of the entire school system and directed the Board to devise a system-wide remedy. The objective was minority enrollment in each school of not less than 30 percent and not more than 55 percent. The Board responded with Phase III in November 1979. The District Court's approval of that plan resulted in a remand by this Court for more detailed findings as to the adequacy of Phase III. *Arthur v. Nyquist,* 636 F.2d 905 (2d Cir. 1981). That remand led to the development by the Board of a plan that came to be known as Phase IIIx, which the District Court approved in May 1981. *Arthur v.*

*Nyquist,* 514 F.Supp. 1133 (W.D.N.Y.1981), *aff'd mem.,* 661 F.2d 907 (2d Cir.1981), *cert. denied sub nom. Griffin v. Arthur,* 454 U.S. 1085, 102 S.Ct. 643, 70 L.Ed.2d 621 (1981). The plan, which went into effect in September 1981, included a combination of magnet schools, early childhood centers, and special academies; pairing and clustering of schools; and a general upgrading of the school system to provide appropriate educational opportunities for disadvantaged minority students and to retain White students in the school system.

The Buffalo school system has now completed the second year of the implementation of Phase IIIx. In the view of Chief Judge Curtin the plan is achieving notable success in reaching the goal of a completely desegregated school system, and it is doing so with a minimum of mandatory pupil assignments or bussing. The Board chose to meet the targeted minority enrollment percentages by establishing innovative programs throughout the system and creating special schools so that a desegregated student population would be distributed throughout Buffalo's schools primarily as a result of the parents' preference for the schools and programs that the Board was providing. Though a plan of this sort has obvious advantages to a program that depends largely on extensive bussing, the implementation of such a plan requires considerable amounts of money.

The Board of Education is wholly dependent on the Mayor and the Common Council of Buffalo for its basic appropriation. It has no taxing authority of its own. The Board receives state and federal aid and is obliged to conform its programs to various requirements imposed by state and federal law. Like most communities where school authorities lack taxing power, Buffalo has experienced annual budget battles when the time has come for the Board to submit its budget requests to the Mayor and the Common Council. In the 1981–82 school year, the added burdens imposed on the Board by the requirements of Phase IIIx placed an extra strain on the budgeting process. That year the plaintiffs in the

desegregation suit returned to court to seek additional funding from the City defendants to enable the Board to implement the court-approved remedy. Fortunately, the parties resolved their differences, agreed to an additional appropriation of $2.1 million, and Chief Judge Curtin entered an order by consent for this additional sum. The current dispute has arisen because agreement could not be reached on the requisite funding for the 1982–83 school year.

For the current school year, the Board submitted to the City defendants its annual budget estimates calling for an appropriation of $162,362,979. Ultimately the City defendants appropriated $150,629,822, an increase of $7.9 million over the funds appropriated for the previous school year. Of sums appropriated for 1982–83 $149,129,822 was for the basic operations and maintenance budget, and $1,500,000 was for capital needs. The Board then determined that it could not implement Phase IIIx at the level of funding appropriated by the City defendants. Though it receded from its initial request of $162,362,979, of which $160,241,029 had been sought for operations and maintenance, it nevertheless sought to increase the operations and maintenance funds by $7.4 million over the appropriated amount. When compromise proved unattainable, the plaintiffs initiated the current round of litigation to require the City defendants to provide the Board with the additional $7.4 million.

The hearing on the plaintiffs' request for additional funding placed the District Court in an unenviable position. On the one hand, Chief Judge Curtin recognized his obligation to determine the remedies necessary to eliminate a constitutional violation. On the other hand, he also recognized the inadvisability of intruding excessively into the details of the administration of the Buffalo public school system. The result was a hearing marked both by presentation of considerable detail concerning school budgeting and by the District Court's reliance upon the good faith of the officials of the Board of Education charged with the responsibility for implementing the school desegregation plan. The Court heard and fully credited the assertions of Eugene T. Reville, the superintendent of Buffalo's public schools, and of Joseph T. Murray, the Associate Superintendent with the major responsibility for implementing the desegregation plan, that the school system could not comply with Phase IIIx without the additional $7.4 million. The principal evidence in support of this conclusion was Murray's presentation of a list of cuts the school system would be forced to make from its requested $162 million budget estimate if it were obliged to live with the $150.6 million appropriated by the City defendants. Included on this list were several items that Chief Judge Curtin found were of special significance to the success of the desegregation efforts, notably all of the teaching positions required to staff the kindergarten and pre-kindergarten programs. The District Court also received and credited testimony concerning the significance of cuts in federal funding and the imposition of new and costly obligations upon the Buffalo school system in order to comply with federal and state law concerning the education of handicapped children and with federal court decrees enforcing those statutory obligations. Ultimately Chief Judge Curtin explained in a comprehensive opinion his reasons for concluding that the City defendants should be ordered to appropriate an additional $7.4 million to the Board. *Arthur v. Nyquist,* 547 F.Supp. 468 (W.D.N.Y. 1982). From that ruling the City defendants appeal.[1]

An unusual aspect of the case in its appellate stage is the position expressed at oral argument by counsel for the plaintiffs. Thomas I. Atkins, Esq., who has represented the National Association for the Advancement of Colored People (NAACP) in more than thirty school desegregation cases, declined to defend the District Court's order, though he had signed plaintiffs' brief

1. On May 27, 1983, we denied the appellants' motion for a stay of the obligation to pay the additional $7.4 million prior to June 30, 1983.

urging affirmance. In his view the District Court had failed to make sufficiently detailed findings to permit a determination as to whether or not the full amount of $7.4 million in additional funding was needed. Perhaps reflecting more the institutional position of the NAACP than the litigating position of the plaintiff students, Atkins decried the attempts of school boards throughout the country, operating under desegregation decrees, to secure additional funding ostensibly but, in his view, not realistically needed to carry out court-ordered remedies. In Atkins' view, school boards were pursuing their private agendas of unmet educational needs, while those advancing the cause of school desegregation were incurring the communities' wrath for the added financial burdens courts were imposing. The concern, doubtless advanced in complete good faith, is a serious one. We are no more disposed to dismiss it lightly than we are to permit its undeniable emotional force to sway our appraisal of what the District Court has ordered in the particular case before us. To that task we now turn.

[1] The authority of the District Court to order the implementation of its remedial plan, including Phase IIIx, has already been adjudicated and is not in issue on this appeal. Nor is there any dispute that a district court may require the expenditure of funds to implement a desegregation remedy. *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). Instead we face the narrower yet more elusive issue whether the Court properly determined the amount of additional money needed to implement the Court's remedy. That issue inevitably involves two related though conceptually distinct questions. The first is whether additional funds have been added only to the extent needed to remedy segregation or to the further and impermissible extent of accomplishing a general improvement in the quality of the local school system unrelated to remedying the effects of segregation. The second is whether the District Court's findings provide an adequate basis upon which an appellate court can determine that funds have been added only for a permissible remedial purpose.

This case presents those questions in a difficult context because of the broad scope of the District Court's remedy, which, in turn, reflects the School Board's commendable preference for relying primarily on voluntary pupil assignments rather than mandatory assignments with extensive bussing. Despite the obvious objections to it, bussing at least has the virtue of being a device that is easily tested to determine whether its scope exceeds the requirements of a desegregation remedy and, once its proper scope is ascertained, its incremental cost is subject to minimal dispute. A voluntary plan like Phase IIIx, however, which depends for its success on many factors including the drawing power of the magnet schools, the quality of remedial and compensatory education offered for the benefit of but not limited to minority students, and, to some extent, the attractiveness of the school system generally to majority students who might desert it, inevitably blurs the line between funds the School Board needs to comply with the Court's remedy and funds it would like to have to improve the discharge of its general educational responsibilities. In determining an appropriate level of funding for a desegregation remedy like the Buffalo plan, a court is entitled to require money for programs that materially aid the success of the overall desegregation effort. A program of that sort is not disqualified for needed funding simply because its inclusion improves the overall quality of the school system. At the same time a court must be alert not to permit a school board to use a court's broad power to remedy constitutional violations as a means of upgrading an educational system in ways only remotely related to desegregation. Striking the balance necessarily requires considerable deference by a district court to the good faith representations of the school authorities, *cf. Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 2461–62, 73 L.Ed.2d 28 (1982), and by a reviewing court to the knowledgeable assessment of a district judge intimately familiar with local conditions.

■ Applying those considerations to this case, we conclude that the District Court's findings, assessed against the record as a whole, are marginally sufficient for us to conclude that the Court acted within its discretion in ordering an additional appropriation of $7.4 million. Chief Judge Curtin was entitled to credit the testimony of the responsible school officials concerning the cuts that would have to be made if the Board of Education were obliged to operate the school system at the level of funding proposed by the City defendants. Without doubt, loss of the positions and programs identified by Associate Superintendent Murray would have seriously impaired the implementation of Phase IIIx. Inevitably, in consideration of an overall school budget there is room for honest difference of opinion as to which items a board of education ought to cut in the event of a reduction in its budget request. The City defendants contend that the Board could have made cuts elsewhere and thereby lived within the City's original appropriation without sacrificing the items on Murray's list of proposed cuts. Our review of this contention would have been aided by a sharpening of the dispute in the District Court. It is not clear precisely what the City defendants believe a line-item budget for the School Board would have looked like if the Board had operated on the original appropriation without making the cuts identified by Murray.

■ In the District Court the City defendants contended that it was the responsibility of the Board to prepare a line-by-line budget indicating precisely how it would spend the amount originally appropriated by the City. Chief Judge Curtin declined to impose this requirement, fearing that it would accord the Mayor and the Common Council "greater control over the education system than is contemplated under the State law," which does not permit the City to "dictate to the Board" the manner of spending appropriated funds. 547 F.Supp. at 482. See N.Y. Education Law § 2576 (McKinney 1981). We do not share the District Court's apprehension on this point. When the School Board seeks the aid of the District Court in ordering the appropriation of additional funds to comply with a court-ordered remedy, it will normally be helpful to see precisely how the Board would expect to spend the level of funding it asserts is inadequate. Such a presentation would reveal not only the items the Board expects to drop from its initial budget estimate, but also the items it expects to retain. No doubt such a presentation would afford the City officials an opportunity to level specific criticisms at various expenditures the Board proposes to make, but such criticisms are not the equivalent of a power to "dictate" the manner of spending. Instead, they simply afford the District Court, and a reviewing court, a focused opportunity to determine how much of the Board's additional request is justified. Whether or not the Board persuades the Court that all or a portion of the requested funds are needed, it is not bound to accede to the City's objections concerning specific expenditure items.

Should a dispute of this nature recur, we think it will normally be helpful if those who seek a court order for additional funding, and those who oppose such an order, supply the District Court with considerable detail reflecting the proposed expenditures in the absence of the additional funds claimed to be needed. Faced with such presentations, the District Court may find it useful to enlist the aid of a neutral auditor, experienced in school budgeting, to assist in analysis of the figures presented.

The absence of such detail in this case, however, does not preclude us from upholding the District Court's order. Associate Superintendent Murray was very specific in detailing the cuts he believed would have to be made without the added funds. Undoubtedly some dollars could have been cut elsewhere in the school budget without impairing the desegregation remedy. But, by the same token, some of the dollars that the Board sought in its initial $162 million budget request and failed to receive, even with the added $7.4 million, undoubtedly would have been useful for the implementation of the plan. Absolute dollar precision

cannot be expected in such matters. We cannot say that the District Court erred in accepting the Board's scaled-down estimate that $7.4 million additional funds were needed. Even with this addition, the Board's budget was approximately $5 million less than its $162 million request. Moreover, that budget request did not seek any additional funds to replace the reduction in federal funds. Chief Judge Curtin found that the Board's federal funding would decrease by more than $10 million. And at the same time that the Board was receiving less federal funds, it was obliged to expend additional money to comply with obligations for the education of handicapped and Spanish-speaking children. These developments support the District Court's conclusion that the City's initial appropriation, though exceeding the 1981–82 appropriation by $7.7 million,[2] would not enable the Board satisfactorily to proceed with implementation of Phase IIIx.

Understandably the City defendants place special emphasis on an affidavit submitted by Murray in which he estimated that "direct expenditures in implementation of the desegregation program" would be $18,147,725 in 1982–83, an increase of $2,084,247 over the comparable figure for 1981–82. The City defendants contend that their $7.7 million increase for the Board in 1982–83 would more than cover this increase in "direct" desegregation costs. An exhibit to Murray's affidavit identifies the following as the components of the $18 million "direct" cost estimate: 145 elementary school teachers, 174 elementary school teacher aides, 58 high school teachers, equipment and supplies at the Early Childhood Centers and the special Academies, some plant expenses, and some bussing expenses. It is obvious from Chief Judge Curtin's opinion that he did not consider these items to be the only costs that the Board was incurring to comply with Phase IIIx. Though he recognized that he "could

not intervene" if the only effect of budget cuts would be to impair the quality of public school education in Buffalo, 547 F.Supp. at 473, he recognized that it was vital to maintain and upgrade a variety of programs that had been initiated to make the desegregation plan succeed. In addition to the magnet schools, he mentioned specifically the full-day kindergarten and pre-kindergarten classes. We agree with Chief Judge Curtin's implicit conclusion that the increase referred to in Murray's affidavit was only part of the increase needed to continue desegregation of the Buffalo school system.

In sum, we recognize, as did Chief Judge Curtin, that it is more costly to achieve desegregation through a plan that relies heavily on the voluntary preference of parents to send their children, White and Black, to high quality schools than simply to pay for the bussing of children to distant schools. The Buffalo Board of Education deserves commendation for the course it is pursuing, and the District Court has not erred in determining that in 1982–83 it needed an additional $7.4 million to continue its progress. We earnestly hope the parties will display the utmost good faith and cooperation to minimize, and preferably eliminate entirely, the need for District Court intervention in future funding disputes.

The judgment of the District Court is affirmed.

---

2. This $7.7 million increase resulted entirely from an increase in state aid of $8.6 million, offset by other adjustments. The City's tax revenues devoted to the Board of Education under the City's proposed appropriation would actually have decreased by $.5 million.