**SAN FRANCISCO NAACP, et al., Plaintiffs,**

v.

**SAN FRANCISCO UNIFIED SCHOOL DISTRICT, et al., Defendants.**

No. C–78–1445–WHO.

United States District Court, N.D. California.

April 1, 1988.

Thomas Atkins, NAACP Sp. Contribution Fund, Brooklyn Heights, N.Y., Peter Graham Cohn, Eva Patterson, San Francisco, Cal., for plaintiffs.

Aubrey V. McCutcheson, Jr., Detroit, Mich., for defendant San Francisco Unified School Dist.

John K. Van de Kamp, Atty. Gen., John Davidson, Deputy Atty. Gen., San Francisco, Cal., for defendant State of Cal.

## OPINION AND ORDER

ORRICK, District Judge.

Plaintiffs, the San Francisco Branch of the National Association for the Advancement of Colored People (the "NAACP") and individual parents proceeding on behalf of their children, have joined with defendants San Francisco Unified School District, its Board Members, and its Superintendent (hereafter collectively called the "District" or the "S.F.U.S.D.") to bring a motion for partial summary judgment on the issue of desegregation financing. Specifically, the moving parties ask that the Court rule that all expenses necessary to implement the terms of the Settlement and Consent Decree ("the Decree") are fully reimbursable by the State of California (the "State"). This joint motion is opposed by the State Superintendent of Public Instruction and the State Department of Education (hereinafter collectively called "State Defendants"), who claim the State is obligated to pay for only 80 percent of these costs. At the hearing on this motion, the Court took the matter under submission, pending consideration of a motion to intervene by the State Department of Finance. The Court has since denied the motion to intervene. After considering the papers filed by the parties, and after hearing oral argument, the Court grants the motion for partial summary judgment. For the reasons set forth below, the Court finds that State Defendants shall reimburse fully all expenses incurred in connection with the Decree.

## I.

### A.

The Decree that is the focus of this motion is the product of countless hours of effort and dedication. A brief overview of the events that led to the formation of the Decree is necessary in order to appreciate what is at stake in this ruling.

When plaintiffs brought this action in 1978, they sought to prove that both the District and State Defendants had deliberately and intentionally created and maintained unconstitutional racial discrimination in the public schools of San Francisco. Plaintiffs pointed to a host of specific practices or policies that they claimed created a segregated school system: constructing new schools and annexes, leasing private property for school use, and utilizing portable classrooms in order to incorporate extant residential segregation into the District; establishing feeder patterns, transfer and reassignment policies, and optional and mandatory attendance zones to situate children in racially isolated schools; implementing racially discriminatory testing procedures, disciplinary policies, and tracking systems within schools and classrooms; and hiring and assigning faculty/admin-

istrative personnel and allocating financial resources in a discriminatory way.

These allegations were denied by the District and State Defendants, and the parties embarked upon a lengthy period of discovery and pretrial preparation lasting over four-and-a-half years. During this time the Court held twenty-five pretrial hearings to consider motions and to remain informed about the status of the case.

At the same time the parties were preparing for trial, they sought to reach a fair settlement of the case. In April 1982, the Court and the parties entered into a three-day series of settlement conferences. Given the promising nature of these discussions, the Court suggested appointing a settlement team, composed of the nation's leading experts on school desegregation, to resolve differences among the parties. The parties agreed, and in May 1982, pursuant to Rule 706 of the Federal Rules of Evidence, the Court appointed eight persons to serve as expert witnesses for the purpose of reviewing plans for settlement and making recommendations to the Court and the parties. This settlement team reviewed memoranda submitted by the parties outlining proposals for achieving complete desegregation within the school system. After numerous interim meetings, the settlement team met at the court on September 22 and 23, 1982, to draft a final proposal. Working with exceptional diligence, the settlement team drafted a recommended agreement, which they presented to the parties. Although areas of dispute remained, the parties agreed that the settlement team's agreement provided a suitable framework for a final settlement.

By December 9, 1982, the parties had drafted most of a proposed Decree, although they remained far apart with respect to a few key provisions. With the parties' consent, the Court appointed the Washington, D.C., firm of Wilmer, Cutler & Pickering to assist the parties in drafting the final Decree. After working around the clock, the parties submitted a proposed Decree to the Court on December 30, 1982.

The Court convened a hearing on that day in accordance with § 1.46 of the Manual for Complex Litigation. At the hearing, the Court made a preliminary determination that the proposed Decree was fair, reasonable, and adequate, and ordered that notice be given to the absentee class members and to the public.

On February 14, 1983, the Court held a public hearing on the fairness of the proposed Decree. Twenty-nine groups or individuals submitted written comments to the Court prior to the hearing, and twenty-three groups or individuals spoke at the hearing. Many of these groups or individuals commended the parties for their efforts. However, many expressed concern that lack of financing could impair implementation of the proposed Decree. For example, in a written statement to the Court, Dr. Zuretti Goosby urged that a reference to "availability of funds" in one of the paragraphs of the proposed Decree "should not be interpreted by anyone as a way out of the terms of this Consent Decree.... The Court should be very clear in all its orders so that the integrity of the Decree can not be undermined [by] such unprincipled interpretations." Fairness Hearing Statement of Dr. Zuretti Goosby, filed Feb. 7, 1983, at 2–3. In a similar statement, Margery Levy wrote that "[i]rrespective of whether [s]tate funds are available, this system-wide desegregation plan must be put into effect. It is long overdue." Fairness Hearing Statement of Margery J. Levy, filed Feb. 7, 1983, at 4.

The Court took all comments by the public into account when deciding whether the proposed Decree was fair, reasonable, and adequate. After carefully considering all the arguments, the Court issued an Opinion and Order on May 20, 1983, declaring that the Decree was fair, reasonable, and adequate. *San Francisco NAACP v. San Francisco Unified School District*, 576 F.Supp. 34 (N.D.Cal.1983) (hereinafter cited as "Opinion"). The Opinion noted the concerns expressed about financing. *Id.* at 48. In response to these concerns, the Court devoted an entire paragraph of its Opinion to the issue of financing:

### J. The State Role in Financing the Plan

The District will incur additional costs during the implementation of the relief ordered by this Decree. Such costs will be compensable by the State as the costs of complying with a court order. The State [D]efendants will assist the District in obtaining reimbursement from the State.

*Id.* at 42.

The Decree itself, filed as an exhibit to the Opinion, contains specific language about financing. According to paragraph 7 of the Decree, one goal of the settlement was "to maximize the amount of [S]tate and federal financial assistance available to assist S.F.U.S.D. to meet its constitutional and statutory obligations...." *Id.* at 53. In paragraphs 45 through 47, the Decree spells out the State's obligation in financing the implementation of the Decree:

### THE STATE ROLE IN FINANCING THE PLAN

45. The parties agree and the Court finds that the costs of compliance with, and monitoring of, this Consent Decree constitute costs mandated by a final court order for which the S.F.U.S.D. is entitled to reimbursement under Sections 42243.6 and/or 42249 of the California Education Code.

46. Defendant California State Department of Education shall assist the S.F.U.S.D. in documenting its claims for reimbursement under Sections 42243.6 and/or 42249 with respect to the costs of compliance with this Consent Decree, and support such claims before the State Legislature, the State Controller and the State Board of Control.

47. In the event that the S.F.U.S.D. claims for reimbursement are challenged, the S.F.U.S.D. and State Defendant shall report to the Court identifying the difficulties in obtaining reimbursement. Any of the parties may propose to the Court action designed to protect the integrity and timely implementation of the provisions of this Consent Decree.

*Id.* at 59. Finally, paragraph 49 provides that "[t]he availability of funds will determine the scope and timing of implementation of the provisions of this Decree." *Id.* at 60.

While not specifically dealing with the issue of financing, two other provisions of the Decree are relevant to the moving parties' request that the Court order full reimbursement. Paragraph 48 of the Decree states that the Court shall retain jurisdiction and enter such additional orders as may be necessary to give full force to the Decree. *Id.* at 59–60. Paragraph 50 provides that any party may propose modification of the Decree to the Court and the other parties. *Id.* at 60.

Since the entry of the Decree on May 20, 1983, the Decree has operated as a model plan for integration in the public schools in San Francisco. All the parties have shown exceptional diligence and resourcefulness in meeting the directives of the Decree. The parties have even agreed to expand the scope of the Decree to cover several additional schools. *See* Stipulation and Order filed Oct. 18, 1985. Although disputes about the Decree have arisen from time to time, the parties and their able counsel have made every effort to work through these disputes in a manner consistent with the best interests of the school children of San Francisco.

### B.

In 1985, the State Legislature and Governor Deukmejian enacted an amendment to the California Education Code sections that provide the very foundation for the Decree. This amendment threatens the future effectiveness and vitality of the Decree.

When the Decree was formulated in 1983, § 42243.6 of the Education Code authorized the State to pay *full* reimbursement to any school district for expenses incurred in carrying out a court mandated desegregation program. The Decree specifically stated that, pursuant to § 42243.6, costs incurred by the District would be reimbursable by the State. Opinion at 59, ¶ 45. This Court's Opinion also made it clear that all additional costs incurred by the District as a result of the Decree would be compensable by the State. *Id.* at 42.

However, in 1985, the Legislature passed and the Governor signed a bill enacting § 42247.3 of the Education Code. This section effectively limits reimbursement of desegregation costs to 80 percent rather than 100 percent. To see how this amendment operates, it is necessary to trace out a Byzantine route between interrelating Code sections.

As previously stated, § 42243.6 authorizes the State to pay full reimbursement to any school district for expenses incurred in carrying out court-mandated desegregation. Section 42243.8 provides that, in the event that claims for reimbursement by various districts exceed the amount of funds appropriated for that purpose by the Legislature, the Controller shall prorate the available funds among the districts. Section 42243.9 of the Education Code provides for supplemental reimbursement to cover those costs not reimbursed after funds are prorated. Finally, § 42247.3 places a limit on the supplemental funding available through § 42243.9. In what must be one of the most confusing statutes on the books, § 42247.3 provides:

(a) Reimbursements authorized by Section 42243.9 for programs operating pursuant to a final court order issued prior to the effective date of this section shall not exceed the sum of paragraphs (1) and (2):

(1) The audited costs approved by the Controller and incurred during the 1984–85 fiscal year, increased by the adjustment calculated pursuant to Section 42247.2.

(2) The amount in excess of one-fifth of the amount obtained by subtracting subparagraph (B) from subparagraph (A):

(A) The audited costs approved by the Controller for reimbursement pursuant to Section 42243.6 for the then current fiscal year.

(B) The amount computed pursuant to paragraph (1).

(b) Reimbursements authorized by Section 42243.9 for programs operating pursuant to a final federal court order issued prior to January 1, 1986, but not implemented until the 1985–1986 fiscal year, shall not exceed the sum of paragraphs (1) and (2):

(1) The audited costs approved by the Controller and incurred during the 1985–86 fiscal year, increased by the adjustment calculated pursuant to Section 42247.2 for each fiscal year thereafter.

(2) The amount in excess of one-fifth of the amount obtained by subtracting subparagraph (B) from subparagraph (A).

(A) The audited costs approved by the Controller for reimbursement pursuant to Section 42243.6 for the then current fiscal year.

(B) The amount computed pursuant to paragraph (1).

The State Controller's Office has interpreted this nearly incomprehensible statute to mean that 1984–85 is the base year for 100 percent reimbursement of court-mandated desegregation costs. According to the State Controller's Office, only 80 percent of the expenditures in excess of the amount made in the 1984–85 school year will be reimbursed by the State. The remaining 20 percent must be paid by the individual school districts. The Director of Fiscal Services for the District has determined that the 20 percent not reimbursed by the State totals *in excess of $4,500,000* for the years 1985–86 and 1986–87. The Director projects an additional *$3,227,000* as the nonreimbursable costs for 1987–88.

In 1987, the Legislature passed AB 289 (Vasconcellos), which would have made 1986–87 the base year for reimbursement calculations for the District. In a letter urging the Governor to sign the bill, School Superintendent Ramon Cortines characterized the 80 percent reimbursement law as unfair to the District. Cortines pointed out that he had already cut over $10,000,000 from the District budget, and stated that "this extra expense dramatically reduces the resources that can be brought to bear to educate our students." Nevertheless, the Governor vetoed the bill.

Given the severe financial plight of the District, and the serious danger the current funding scheme poses to the integrity of

the Decree, the District and plaintiffs have joined together to ask this Court to rule that the State is obligated for 100 percent reimbursement. The moving parties make arguments based on contract and constitutional law. State Defendants oppose the motion, arguing that the Court cannot bind the Legislature and the Governor or invalidate the 1985 amendment.

## II.

 Although § 42247.3 of the Education Code is complicated, all parties agree that it authorizes the State to reimburse only 80 percent of the court-ordered desegregation costs, as opposed to the 100 percent reimbursement authorized at the time the Decree was entered. Moreover, it seems clear that this amendment would operate retroactively to cover the Decree. Although legislative amendments affecting substantive rights are not normally construed to apply retroactively, amendments will be applied retroactively when the legislature has expressed such an intent or when this intent can be clearly implied in the amending language. *Winfree v. Northern Pacific Railway Co.*, 227 U.S. 296, 33 S.Ct. 273, 57 L.Ed. 518 (1913); *Koster v. Warren*, 297 F.2d 418, 420 (9th Cir.1961). The language of § 42247.3 demonstrates that the California Legislature intended it to operate retroactively. Subparagraph (a) refers to "programs operating pursuant to a final court order issued prior to the effective date of this section"; subparagraph (b) refers to "programs operating pursuant to a final federal court order issued prior to January 1, 1986, but not implemented until the 1985–86 fiscal year." Thus, the amendment limits State reimbursement of costs arising under the 1983 Decree.

## III.

Although the 1985 amendment operates retroactively, the moving parties contend that the State is obligated to reimburse 100 percent of the costs of implementing the Decree. They argue strenuously that the Decree is a contract—a tripartite agreement binding on State Defendants that cannot be unilaterally rewritten.

According to the moving parties, the District made it clear throughout the settlement process that it would be unable to perform the desegregation measures called for in the Decree without substantial infusions of money from the State. The only source of State funds identified in the settlement negotiations and in the Decree was that provided under §§ 42243.6 and 42249 of the Education Code. According to the moving parties, they made it clear to the Court they were relying upon these Code Sections as the basis for settlement. As the moving parties sum up their argument based on contract law, "The bargain struck before this Court on the eve of trial was for full funding and it continues to this day." Joint Reply of Plaintiffs and the S.F.U.S.D. to State Defendants' Response to Motion for Summary Judgment on Desegregation Financing, filed Nov. 20, 1987, at 2–3. The moving parties claim that by amending the Education Code the State has unilaterally rewritten the terms of the settlement and the Decree.

State Defendants admit, as they must, that a key element in the settlement was the knowledge that the state law in 1983 authorized full reimbursement to any school district for expenses incurred in carrying out court-mandated desegregation. State Defendant's Response to Joint Motion for Partial Summary Judgment by Plaintiffs and the San Francisco Unified School District on Desegregation Financing, filed Nov. 9, 1987, at 7. State Defendants argue, however, that they are not responsible for the actions of the Governor and the Legislature and, thus, are not responsible for the change in the reimbursement law. While State Defendants are a state official (the Superintendent of Public Instruction) and a state agency (the Department of Education), they claim they are not "The State" in any more comprehensive sense and, thus, should not be held accountable for the actions of other State actors. State Defendants argue that they have always been "scrupulously careful" to make clear to the Court and all parties the limited nature of their power. *Id.* at 3.

According to the State Defendants, "the point was frequently made [during the settlement negotiations] that the named [S]tate [D]efendants had no power to amend legislation, appropriate or disburse state funds, or otherwise guarantee that the S.F.U.S.D. would have their [sic] claims fully reimbursed." *Id.* at 3. State Defendants conclude that if plaintiffs had shown the foresight to name the Legislature, the Governor, the Department of Finance or the Controller as defendants at the outset of the lawsuit, then the truly responsible parties would be before the Court and accountable under the Decree.

There are many compelling aspects to State Defendants' argument. It is true that the named defendants in this suit are the State Superintendent of Public Education and the State Department of Education, state entities whose function does not include the power to amend legislation or appropriate funds. It is also true that the Governor and the Legislature, the state entities responsible for amending the reimbursement law, are not technically parties to this lawsuit. It may even be true that State Defendants pointed out the limited nature of their role and authority when signing the Decree. The Court does note that throughout the history of this lawsuit State Defendants have always acted conscientiously and diligently, and have often provided guidance and leadership to the other parties.

■ Nevertheless, the Court cannot ultimately accept this argument. To do so would be to absolve the State of its responsibility for the desegregation measures contained in the Decree. The State has indeed entered into a bargain with the moving parties to provide financial support vital to the school children of San Francisco. The State cannot now unilaterally change the terms of this bargain, while taking refuge behind different bureaucratic shells. While the named defendants may be a specific State Department and a particular State Superintendent, it is the height of legal formalism to say these State Defendants do not represent the State in any comprehensive manner. The fact remains that the State, as represented by the Attorney General of California, was and is a party to this Decree. State Defendants are not autonomous entities operating in a void—they are creations of the State and representatives of the State. This Court will not permit the State to use mere semantics to shrug off the reimbursement responsibility it has voluntarily assumed.

The Court's decision to hold State Defendants to their bargain notwithstanding the actions taken by other state actors is not unprecedented. In *Delaware Valley Citizens' Council v. Pennsylvania,* 533 F.Supp. 869 (E.D.Pa.1982), *aff'd,* 678 F.2d 470 (3d Cir.1982), the court was faced with an argument by certain Commonwealth defendants that funding restrictions recently passed by the legislature prevented them from complying with a consent decree they had signed. Judge Bechtle rejected this argument, holding that "[t]he fact that these defendants that are before the Court have been prevented by a part of the Commonwealth that is not before the Court from carrying out the decree does not insulate the parties before the Court from the consequences of a self-imposed failure to fulfill the obligations of the judgment that is before the Court and represented by the decree." *Id.* at 881. Similarly, in this case State Defendants cannot insulate themselves from their obligations under the Decree by placing the blame on the State Legislature and the Governor.

Nor can State Defendants shirk their responsibility by shifting the burden on to plaintiffs. While it is true that plaintiffs *could have* named a laundry list of state agencies as defendants to protect themselves against intra-state waffling, plaintiffs should not be penalized for failing to do so. Both plaintiffs and the District reasonably relied on the explicit commitment by the named State Defendants to provide full reimbursement for desegregation costs pursuant to § 42243.6 of the Education Code. As the Decree makes clear, State Defendants were to play an active role in securing full reimbursement from the State. Paragraph 46 provides: "Defendant California State Department of Education shall assist the S.F.U.S.D. in documenting

its claims for reimbursement under Sections 42243.6 and/or 42249 with respect to the costs of compliance with this Consent Decree, and *support such claims before the State Legislature, the State Controller and the State Board of Control.*" Opinion at 59 (emphasis added). By signing the Decree, State Defendants committed themselves to full financing of the desegregation measures, even when doing so would put them at odds with the State Legislature, the State Controller, or the State Board of Control. The Court emphasized to State Defendants that they were assuming affirmative financing obligations; the Court declared in its Opinion that all desegregation costs *"will* be compensable by the State" and that "the State [D]efendants *will* assist the District in obtaining reimbursement from the State." *Id.* at 42 (emphasis added). For State Defendants now to claim they are powerless and at the mercy of other state entities contradicts the affirmative obligations State Defendants assumed when they signed the Decree.

Finally, State Defendants cannot be allowed to use paragraph 49 of the Decree to escape from their contractual obligations. Paragraph 49 provides that "[t]he availability of funds will determine the scope and timing of implementation of the provisions of this Decree." State Defendants argue that paragraph 49 makes the implementation of the Decree *contingent* on the availability of funding. According to State Defendants, this paragraph suggests that the level of state funding is variable. They conclude that it implicitly acknowledges the power and the right of the State Legislature to change the level of funding.

State Defendants' interpretation of paragraph 49 is untenable. While paragraph 49 refers to financing with regard to the *scope* and *timing* of the desegregation programs, it does not permit the level of financing to be so altered as to destroy the *viability* of the Decree. As Dr. Goosby urged, the reference to availability of financing in paragraph 49 cannot and should not be interpreted as a loophole that the State can use to avoid its responsibilities. Fairness Hearing Statement of Dr. Zuretti Goosby

at 2–3. If State reimbursement were cut to 80 percent, the District would be saddled with an insurmountable financial burden; the Director of Fiscal Services for the District has estimated almost eight million dollars in additional costs for the three years since the amendment was passed. Such a heavy financial burden threatens the very existence of the Decree and the desegregation programs it mandates. The District has represented to plaintiffs that, without full reimbursement from the State, the District will be forced to terminate many provisions of the Decree and reduce others to levels wholly unacceptable to plaintiffs. Declaration Supporting Joint Motion for Summary Judgment by Plaintiffs and the S.F.U.S.D. on Desegregation Financing filed Oct. 15, 1987, at 4.

In short, State Defendants cannot be permitted to use one paragraph in a twenty-six page document as an escape hatch, when to do so would vitiate the entire Decree. Even if paragraph 49 did provide flexibility on financing as State Defendants claim it does, State Defendants would still be obligated to come into Court and propose specific modifications to the Decree pursuant to paragraphs 47 and 50. Paragraph 47 provides that in the event difficulties arise concerning reimbursement, State Defendants must report on the problems to the Court and may suggest ways "to protect the integrity and timely implementation of the provisions of this Consent Decree." Opinion at 59. Similarly, paragraph 50 ensures that any modifications to the Decree will be agreeable to all parties and the Court; it also ensures these modifications will not undermine the effectiveness of the Decree. *Id.* at 60.

Given the commitment State Defendants made in this tripartite agreement, the Court cannot now sit idly by and watch the State *unilaterally* change terms that the moving parties have bargained for and relied on, especially when these terms are so essential to the continued success of the Decree.

## IV.

The Decree is obviously much more than an ordinary contract. It is also a

binding judgment and order of this Court. *See United States v. Swift & Co.*, 286 U.S. 106, 114–15, 52 S.Ct. 460, 462–463, 76 L.Ed. 2d 999 (1932) (rejecting the argument that a consent decree is to be treated as a mere contract, and holding that a consent decree, although negotiated by the parties, is a judicial act). In enforcing the Decree, the Court can use the broad range of equitable powers that are available to a court to enforce and effectuate its orders and judgments. *Delaware Valley*, 553 F.Supp. at 880.

The Court intends to use its full power to enforce the Decree, because the constitutional rights of the schoolchildren of San Francisco are at stake. It is hornbook law that federal courts have the power and the duty to protect constitutional rights. Federal courts cannot be thwarted in this important mission by state legislatures or their protestations of poverty. As one court held when faced with arguments from a state that it could not fund court-ordered relief, "In the face of constitutional violations at a state institution, a federal court can order the state either to take the steps necessary to rectify the violations or to close the institution. Thus, a state cannot avoid the obligation of correcting the constitutional violations of its institutions simply by pleading fiscal inability." *New York State Association for Retarded Children, Inc. v. Carey*, 631 F.2d 162, 165 (2d Cir.1980). In this case, the Court will not allow the State of California to flout its financial obligations and jeopardize the constitutional rights of schoolchildren, no matter what the current political climate in the State may be towards desegregation financing. This Court agrees with Judge Bechtle when he says:

> The Orders of the Court in this case are not contingent upon political conditions. Rather, this Court's Orders in this litigation are based solely on the rights of the [parties]. . . .
>
> This Court is concerned with the vindication of these legal rights, not the methods by which the . . . defendants intend to fund the . . . [programs] required by this Court's Orders.

*Halderman v. Pennhurst State School & Hospital*, 555 F.Supp. 1144, 1159 (E.D.Pa. 1983). Thus, notwithstanding the priorities of the State concerning the best use of available funds, the State must comply with the binding order and judgment of this Court. *See id.* at 1162.

In contrast to State Defendants' crabbed conception of the role of the Court, this Court has broad powers to enforce and effectuate its Decree. This Court is not powerless before state legislation that is at odds with the Decree and the constitutional rights the Decree vindicates. State law cannot be allowed to interfere with federally-mandated remedial measures. *See Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed. 2d 823 (1979) (federal court can order state agency to prepare rules implementing federal court's order even if the state law withholds from the agency the power to do so); *North Carolina State Board of Education v. Swann*, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971) (invalidation of state antibusing statute because statute "would inescapably operate to obstruct the remedies granted by the District Court"). The principle that judges must play active roles to defend their orders is so fundamental to our system of government that as early as 1809, Chief Justice Marshall proclaimed, "If the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery; and the nation is deprived of the means of enforcing its laws by the instrumentality of its own tribunals." *United States v. Peters*, 5 Cranch 115, 136, 9 U.S. 115, 3 L.Ed. 53 (1809).

## V.

■ In ruling that full state reimbursement is necessary to vindicate constitutional rights, the Court must take care not to create new constitutional problems. Although State Defendants did not address these issues, the Court has carefully considered the Tenth and Eleventh Amendments, as well as general notions of feder-

alism, and has concluded that its order to the State to provide full reimbursement does not offend the State's constitutional guarantees of sovereign immunity and autonomy.

In *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (hereinafter cited as *"Milliken II"*), the Supreme Court rejected arguments from the State of Michigan that a district court order requiring the state to pay desegregation costs was barred by the Eleventh Amendment. The district court had ordered the state to pay one-half of the costs attributable to the educational components of a desegregation plan; the state claimed that this was an award of money damages against the state that violated the Eleventh Amendment. Although the Eleventh Amendment does prohibit the award of retrospective monetary damages (*see Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)), the Supreme Court held that the monetary relief ordered by the district court operated *prospectively* to wipe out continuing conditions of inequality and, thus, was not barred by the Eleventh Amendment. *Milliken II*, 433 U.S. at 288–90, 97 S.Ct. at 2761–62. The mere fact that the relief ordered was "compensatory" did not change the fact that it operated prospectively to bring about equality in the school system. *Id.* at 290, 97 S.Ct. at 2762. The Supreme Court emphasized that federal courts have the right "to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury." *Id.* at 289, 97 S.Ct. at 2761–62.

The Supreme Court in *Milliken II* also found no merit to the state's claim that the district court's order violated the Tenth Amendment and general principles of federalism. *Id.* at 291, 97 S.Ct. at 2762–63. Stressing the limited nature of the district court's order, the Supreme Court stated:

> The District Court has neither attempted to restructure local governmental entities nor to mandate a particular method or structure of state or local financing. The District Court has, rather, properly enforced the guarantees of the Fourteenth Amendment ... in a manner that does not jeopardize the integrity of the structure or functions of state and local government.

*Id.* at 291, 97 S.Ct. at 2762–63 (citation omitted).

Similarly, in *Griffin v. County School Board of Prince Edward County*, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), the Supreme Court stated that it had "no doubt" about the power of a district court to give orders to local government officials on matters of school financing. *Id.* at 232–33, 84 S.Ct. at 1233–34. The Supreme Court went so far as to state that a district court may order the county government to levy taxes to raise the funds necessary to operate a nondiscriminatory public school system. *Id.* at 233, 84 S.Ct. at 1234. By emphasizing the broad powers federal courts have to vindicate federally guaranteed rights, the Supreme Court implicitly rejected any argument that such judicial action constituted an unconstitutional invasion of state sovereignty. *Id.*

Given these precedents, this Court is satisfied that its ruling in this case in no way offends the rights of the State, the State Legislature, or the Governor. In ordering the State to pay full reimbursement for all desegregation costs the District incurs, the Court is not jeopardizing the integrity of the State government or its legislative process. The Court is not mandating any particular method by which the State must raise the funds necessary for reimbursement. Rather, the Court is merely carrying out its duty to protect federally-guaranteed rights.

While no Ninth Circuit case offering guidance on this issue has come to the attention of the Court, several other Circuits have considered the issue of how active federal courts may be in determining how school integration plans will be financed. While different circuits vary in the degree of deference they accord the state, the most persuasive opinions hold that allocating the costs of a desegregation plan is fully within a court's power, and is not an invasion of a state's sovereignty.

For example, in *United States v. Board of School Commissioners of Indianapolis*, 677 F.2d 1185 (7th Cir.1982), *cert. denied* 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982), the Seventh Circuit found it was appropriate for the district court to place the entire burden of paying for a desegregation plan on the state, even in the face of a state statute that provided the state would pay only one-half the costs. Citing *Milliken II*, the Seventh Circuit held that allocating the costs of a desegregation plan is part of the remedial power of a district court. 677 F.2d at 1186. The Court firmly rejected the argument that the district court had improperly invaded the state's sovereignty, stating:

> The General Assembly retains its authority over school financing subject only to the requirement that it adequately support the desegregation plan. ... It is not the province of a federal court to instruct the legislature on how it should finance its obligations. The district court did not attempt to do so. The court did what was within its authority— order a wrongdoer to pay the costs of remedying its wrongdoing.

*Id.* at 1190.

Similarly, in *Liddell v. Board of Education of St. Louis*, 667 F.2d 643 (8th Cir. 1981), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 634, 70 L.Ed.2d 614 (1981), the Eighth Circuit held that it was within the district court's discretion to order that the state pay part of the costs of integrating the St. Louis school system. Despite the state's objections that the district court had ordered it to pay too much, the Circuit affirmed the district court's order. *See also Little Rock School District v. Pulaski County Special School District*, 839 F.2d 1296, 1307 (8th Cir.1988).

Moreover, in *Arthur v. Nyquist*, 712 F.2d 809 (2d Cir.1983), *cert. denied*, 466 U.S. 936, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984), the Second Circuit held that the district court was acting within its discretion in ordering government defendants to appropriate additional money to eliminate desegregation in the public school system.

*Evans v. Buchanan*, 582 F.2d 750 (3rd Cir.1978) (*en banc*), *cert. denied*, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 268 (1980), provides more limited support for the proposition that a federal court can order a state to finance a school desegregation plan without impinging on state autonomy. In *Evans*, the Third Circuit balanced the duty of a federal court to ensure that its remedial decrees are carried out against the right of elected legislators to set the specific tax rates necessary to raise money. The Third Circuit declined to reach the merits of the lower court's decision to order that a uniform tax rate be established throughout the desegregation area. *Id.* at 778. Nevertheless, the Third Circuit did note that *Milliken II* provided "formidable legal support" for the monetary relief the district court ordered. *Id.* at 769. The Court also made clear that in some situations the state's failure to allocate adequate funds "would clearly be unacceptable as interference with the operations of the desegregation decree." *Id.* at 780.

Given the persuasive reasoning of the Seventh, Eighth, Second, and Third Circuits, the Court is satisfied that its ruling that the State must pay full reimbursement is correct. It is true that cases do exist that suggest the contrary. *See United States v. Texas Education Agency*, 790 F.2d 1262 (5th Cir.1986) and *Kelley v. Metropolitan County Board of Education of Nashville & Davidson County, Tennessee*, 836 F.2d 986 (6th Cir.1987). However, these cases are not compelling. The *Texas Education Agency* case is distinguishable on its facts from the case before this Court. In *Texas Education Agency*, the state had never been an active participant in the litigation and no court orders were directed at the state. This lack of state involvement contrasts sharply with the active involvement of the State in this case. Although the facts in *Kelley* are more analogous to the case at bar, the legal reasoning in *Kelley* is not persuasive. In *Kelley*, the Sixth Circuit held that a district court's order to a state to pay for desegregation costs violated the Eleventh Amendment. In so ruling, the Sixth Circuit refused to acknowledge that *Milliken II* is

formidable legal precedent for the right of a district court to make such an order. Because the Sixth Circuit gave such short shrift to *Milliken II*, this Court finds its opinion unconvincing. In sum, the Court is not dissuaded by either *Texas Education Agency* or by *Kelley* from ordering the State to provide full reimbursement.

## VI.

In conclusion, the Court recognizes that its ruling may pose some practical difficulties for the named State Defendants, who argue that they have no control over the State's funding mechanism. However, the Court believes its decision today is just, given the constitutional rights at stake and given the commitment State Defendants made when they signed the Decree. It was counsel for State Defendants who expressed this sense of commitment most eloquently, when he said at the Fairness Hearing:

> The law requires fairness, and reasonableness, and adequacy. And that's what this Consent Decree embodies. ...
>
> ... [I]f any one of the parties to this case had had their own way, the outcome would have been very different. But that wasn't the case. No one dictated the outcome. And, therefore, all of us probably have elements in this Consent Decree that we would have liked to have seen in a different form, or to a different extent. But we're prepared to live with it as it is.

> . . . . .

> ... [W]hen this Consent Decree is approved, ... it will become a binding enforceable order of this Court. And I don't think there's any attorney in San Francisco, who is familiar with the situation, who doubts that this Court has both the ability and the will to enforce its orders. ...

> . . . . .

> That's not to say there won't be disappointments and there won't be conflicts.

> . . . . .

But I think the commitment that went into reaching this Consent Decree is the same kind of commitment that can make it work.

Court Transcript, Fairness Hearing, Feb. 14, 1983, at 55–58.

Accordingly,

IT IS HEREBY ORDERED that the moving parties' motion for partial summary judgment is GRANTED. The State shall reimburse the District for the full amount of all expenses incurred in the implementation of the terms of the Decree.